# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BAKERY BLING, a d/b/a of LITTLE WAISTED, LLC,<br><br>            Plaintiff,<br><br>v.<br><br>MATRIX PACKAGING MACHINERY, LLC,<br><br>          Defendant. | Case No. 21-CV-1399-JPS<br><br><br>**ORDER** |

## 1.    INTRODUCTION

Now before the Court are Defendant Matrix Packaging Machinery, LLC's ("Defendant") and Plaintiff Bakery Bling, a d/b/a of Little Waisted, LLC's ("Plaintiff") cross motions for summary judgment and partial summary judgment on (1) Plaintiff's breach of contract claim, with Defendant's motion also including a motion to "enforce the contractual damages limitation provision between the parties," ECF Nos. 104, 110; (2) Plaintiff's Wisconsin Deceptive Trade Practices Act (the "WDTPA") claim, ECF Nos. 106, 116; and (3) Plaintiff's claim of fraudulent and/or intentional misrepresentation, ECF Nos. 108, 114. Also before the Court is Plaintiff's motion for summary judgment on "Defendant's affirmative defense on limitation of damages." ECF No. 112.[1]

---

[1] The parties filed separate motions for summary judgment with respect to each individual claim raised in Plaintiff's amended complaint, apart from Count I, which is Plaintiff's claim for a declaratory judgment on the terms of the contract. As noted herein, *infra* note 5, the dispute underlying Count I has already been adjudicated. The practice of filing separate motions for summary judgment with respect to each remaining individual claim is an unusual one that the Court can

For the reasons discussed herein, the Court will grant Plaintiff's motion for summary judgment on its breach of contract claim (and accordingly deny in part Defendant's cross motion for partial summary judgment on the breach of contract claim), but will dismiss Plaintiff's claims for fraudulent/intentional misrepresentation and for violation of the WDTPA (and accordingly grant Defendant's motions for summary judgment on those claims). Further, the Court will deny Plaintiff's motion for summary judgment with respect to limitation of damages (and accordingly grant in part Defendant's cross motion for partial summary judgment on this issue). As a result, the case will be dismissed, and the currently pending Rule 702 motions and motions in limine, ECF Nos. 80, 82, 84, will be denied as moot.

## 2.    FACTUAL BACKGROUND[2]

### 2.1    The Parties and Other Relevant Players

Plaintiff is a business located in Oklahoma that sells decorative cookies and gingerbread house kits for holidays and special occasions. Defendant is a business located in Wisconsin that sells large commercial packaging machines. Defendant is a separately incorporated subsidiary of

---

only assume was motivated by a desire to evade applicable page limit requirements.

   [2]The following recitation of facts is drawn from the parties' agreed upon statement of facts, ECF No. 102, with minor, non-substantive edits. Internal citations therein have been omitted for brevity. The parties additionally proffered their respective disputed facts at ECF No. 102 at 20, which the Court notes where applicable.

   This Order will also cite to and rely on the relevant contractual documents in this case, which are not recited here in full, but to which the parties do not dispute that they are bound. *See* ECF Nos. 102-10 (the "Contract"), 102-11 (the "T&Cs"), and 102-6 (the "Offer" between Tecnics, as defined *infra*, and Defendant).

Pro Mach, Inc. ("Pro Mach").[3] FL Tecnics ("Tecnics") is a subsidiary of Pro Mach and is located and incorporated in Spain.

## 2.2 The Beginning of the Business Relationship

In early 2019, Plaintiff's principal, Lauren Brooks ("Lauren"), and her husband, Trevor Brooks ("Trevor"), met Spencer Johnson ("Johnson"), Defendant's Regional Sales Manager, at a trade convention. Plaintiff attended the convention with the intention of finding a machine that could automate the filling of its royal icing (the "Royal Icing") into its triangular premade polyethylene bags. One of Johnson's job duties was to contact and communicate with Plaintiff.

On or about April 16, 2019, Defendant obtained samples of Plaintiff's Royal Icing. On September 19, 2019, Defendant, through Johnson, contacted Tecnics to inquire what kind of machines Tecnics could manufacture to fill Plaintiff's Royal Icing into its triangular premade bags. On or before September 22, 2019, Defendant informed Tecnics that Plaintiff's premade triangular bags were made from polyethylene material. Defendant told Tecnics: "Right now the customer is using poly, but I am sure they are open to change as long as they get the correct shape with their pouch. I have attached two pieces of documentation that [Plaintiff] sent me . . . this should give us a good idea on how we stack-up." On October 9, 2019, Defendant was in possession of samples of Plaintiff's premade triangular polyethylene bags filled with Plaintiff's Royal Icing and sent pictures thereof to Tecnics.

---

[3]On February 27, 2023, the parties stipulated to the dismissal without prejudice of Pro Mach as a defendant from this action. ECF No. 101. The Court adopted that stipulation. ECF No. 103.

### 2.3 The Offer

On November 4, 2019, Tecnics issued an offer (the "Offer"), *see* ECF No. 102-6 at 9–23, to Defendant for the manufacture and sale of a FLtecnics Model FL 1.7 H PMP STU 1 XL HFS Machine with Integrated Liquid Filler (the "Machine"). The Offer reflected a sales price of €118,116.50[4] and entailed the following specifications: (i) Product was "frosting"; (ii) two options for filling weight: 4 ounce and 8 ounce; (iii) pouch/bag type "pre-made cone/triangular shaped bags"; (iv) machine rate was 35–40 pouches per minute; (v) minimum bag size was 85x100mm and maximum bag size was 170x30mm; and (vi) the following specifications were to "be confirmed by customer": product density, product temperature, filling volume, format size, seal type, and film composition. Tecnics conditioned the final output rate of the Machine as follows: "Final output to be confirmed by [Tecnics], once the tests with client's original product and film are done." Tecnics would build the Machine "from scratch."

On October 15, 2019, Tecnics, through its Project Manager, Alex Marzo ("Marzo"), informed Defendant that Plaintiff's polyethylene triangular bag "looks very thin and probably will not be the good one to work" with the Machine. Johnson replied that Plaintiff was "open to change . . . as you can see from the 'sample cones' that were sent in from [Defendant's] competition." Defendant did not inform Plaintiff of this information or these statements from Tecnics. On November 18, 2019,

---

[4]In other words, Defendant paid Tecnics the equivalent of approximately $132,097 USD to manufacture the Machine in order to re-sell it to Plaintiff. FORBES, *Currency Converter*, https://www.forbes.com/advisor/money-transfer/currency-converter/eur-usd/?amount=118116.5 [https://perma.cc/SCA2-62YW] (last visited July 19, 2023) (exchange rate as of July 19, 2023).

Defendant obtained Plaintiff's "kits" containing Royal Icing and triangular polyethylene bags.

### 2.4 The Contract

On November 21, 2019, Defendant, through Johnson, issued a proposal for the resale of the Machine (the "Contract") to Plaintiff in the amount of $265,000.00. *See* ECF No. 102-10. On December 2, 2019, Plaintiff executed the Contract. The Contract incorporates an additional document entitled "Terms and Conditions of Sale" (the "T&Cs"). *See* ECF No. 102-11.[5] On December 2, 2019, Plaintiff completed and executed Defendant's "New Customer & Credit Application Form" requesting financing of $200,000.00 for purchase of the Machine.

The Contract provided the following specifications for the Machine: (i) Product was "frosting"; (ii) two options for filling weight: 4 ounce and 8 ounce; (iii) pouch/bag type "pre-made"; (iv) the machine rate was 35-40 pouches per minute; and (v) the pouch/bag size was to be determined. The Contract conditioned the Machine's speed rate as follows: "Speeds are estimates and cannot be guaranteed without testing both product and film."

### 2.5 Engineering and Testing the Machine

On or before February 4, 2020, Tecnics began working on engineering drawings for the Machine. On February 19, 2020, Defendant issued a Purchase Order to Tecnics for purchase of the Machine in the amount of €180,116.50.

---

[5] On November 28, 2022, this Court, on Plaintiff's motion for reconsideration and for declaratory judgment, declined to disturb Judge Patrick R. Wyrick of the United States District Court of the Western District of Oklahoma's holding that the T&Cs were validly incorporated into the Contract and therefore binding on the parties. *See generally* ECF No. 70.

On February 24, 2020, Tecnics requested that Defendant send 100 sample bags/pouches used by Plaintiff. On February 27, 2020, Tecnics, through Marzo, informed Defendant: "We have to start work on the project on the dosing system and after see a video of a Toyo machine filling similar product and buy some frosting product and see how it is we are worry [sic] about the dosing. Product we see is very thick and compact and we don't know how be the final one, that is why is so important if we can get some video or samples on how product behave." Defendant did not inform Plaintiff of this information or these statements from Tecnics.

On March 11, 2020, Defendant sent Tecnics pictures and video of Plaintiff's Royal Icing product. Marzo later testified that "the consistency of the product we saw on that video was not even close to what we saw on the TOYO machine [ . . . ] we could see the flow of the product going up of [sic] the nozzle, it was like creamy. So we didn't see any—any impediment in our system to fill that type of product."

Defendant proffers as a disputed fact that because Plaintiff did not provide a viscosity reading for its Royal Icing, Marzo testified that Tecnics based the design of the Machine on the product seen in this video provided by Plaintiff: "More or less, based on that, it seemed like the dosing of mayonnaise, and we designed the system based on that information." ECF No. 102 at 20. Plaintiff proffers as disputed facts that the Contract did not require Plaintiff to submit viscosity measurements to Defendant, that the Offer did not require Defendant to submit viscosity measurements to Tecnics, and that Defendant did not ask Plaintiff for the viscosity measurements at any time prior to the delivery of the Machine. *Id*.

On March 21, 2020, Defendant told Plaintiff that the engineering work had commenced and requested a down payment to place the project into the production schedule.

On March 19, 2020, Tecnics informed Defendant that it received the pictures and video of Plaintiff's Royal Icing and bags/pouches and that because Plaintiff's bag/pouch was made from 100% polyethylene it "will not work on the machine as well as the triangular shape, pouch should have a straight square parts on the top, if it is completely triangular also will be not possible to get it run [sic] because no way to keep the pouches straight on the conveyor magazine." Defendant did not inform Plaintiff of this information or these statements from Tecnics.

On April 20, 2020, Tecnics received 300 of Plaintiff's empty bags/pouches from Defendant and made the following statement to Defendant: "As we were afraid this type of pouches [sic] can no [sic] run on the machine for two main reasons. 1. They are completely triangular and cannot be guided straight on the pouch magazine. 2. The material is 100% polyethylene and cannot be sealed on our machine with the standard sealing jaws . . . . Please explain and inform Customer about this." Defendant did not inform Plaintiff of this information or these statements from Tecnics.

On May 4, 2020, Tecnics made the following statements to Defendant about Plaintiff's bags/pouches: "As I inform [sic] we did receive the samples and after been [sic] reviewed by engineering and as I explain on my previous email we doubt we can run this type of material and pouch in our machines. We will need minimum a side seal which is not on the samples." Defendant did not inform Plaintiff of this information or these statements from Tecnics.

Marzo testified that as a consequence of the pouch design and composition, Tecnics had to redesign the pouch loader system because the standard design would not work: "A part of the machine had to be redesigned so that it could work with the totally triangular pouch, but the final machine ended up working with the totally triangular pouch."

On or about May 6, 2020, Plaintiff paid Defendant the full purchase price of $265,000.00. On or about May 20, 2020, Defendant formally assigned a project manager, Matt Rehm ("Rehm"), to Plaintiff. One of Rehm's job duties was to convey information from Tecnics to Plaintiff and from Plaintiff to Tecnics.

On May 20, 2020, Defendant informed Tecnics that Plaintiff intended to use the same bag/pouch to hold its two fill sizes—4 ounces and 8 ounces—of its Royal Icing. On May 28, 2020, Defendant informed Tecnics that it had obtained the density measurements from Plaintiff of Plaintiff's Royal Icing, and that the density was "between 1 and 1.2."

On June 8, 2020, Lauren represented that a Machine completion date of September 16, 2020 "will ruin [Plaintiff's] entire holiday production." She testified in her deposition that Plaintiff needed the machine for August because she knew the business could not get through the holiday season without it. On June 12, 2020, Pro Mach's Senior Vice-President Troy Snader ("Snader"), who was responsible for overseeing Defendant's operations, confirmed an agreement with Plaintiff to split the cost to airship the Machine for August delivery.

On June 17, 2020, Defendant requested that Plaintiff ship its Royal Icing to Spain for Tecnics to use it to test the Machine. Plaintiff proffers as a disputed fact that this was the first time Defendant had informed Plaintiff that Plaintiff would need to ship its Royal Icing to Spain.

Defendant also advised Plaintiff that "because its Royal Icing product contains eggs, it may not be allowed to pass through customs at Spain's port of entry." Accordingly, Defendant suggested that Plaintiff "source similar test product from somewhere in Europe . . . ." Defendant also informed Plaintiff that "any delay in receiving the requested samples can cause delay in machine completion . . . ."

On July 7, 2020, Defendant asked Plaintiff if it had "been able to secure test product [Royal Icing] from Europe." That same day, Johnson told Rehm by email, "Did you reach out to [Tecnics] to see if they can source this locally? . . . I don't believe [Plaintiff] knows that they were expected to source this . . ."

On July 8, 2020, Marzo told Defendant: "Regarding product we already try and purchase something we thought was similar (Frosting) and what we receive [sic] was impossible to be dose [sic] as it was too thick. For what we saw on the video the product looks creamy, we can look to see if we can get something similar, in the case we found something we believe is similar is very important to let know Customer that we cannot be responsible if after when the machine is install [sic] the final product does not work as it should." Defendant did not inform Plaintiff of this information or these statements from Tecnics.

In his deposition, Marzo provided further explanation with respect to his July 8, 2020 statements: "If it's done with similar products or with a product that is not the same as the one that the client works with at its facilities, then we can't guarantee that there won't be any problems when it comes time to install the machines. And what I mean here is that we can't be liable if when we install the machine we have dosing problems, which is what happened because the product wasn't the same. That's what I mean

to say in this statement." Marzo testified further that he expected Defendant "to transmit this information" to Plaintiff. Marzo also testified that the test product obtained in Spain was a "finished product" presumably from northern Spain "because we couldn't find it here locally." He described this "finished product" as "like concrete."

On June 18, 2020, Defendant resent its request for a sample of Plaintiff's Royal Icing and 5,000 icing bags/pouches. Marzo testified in his deposition that Tecnics had enough of Plaintiff's bags/pouches to perform the "Factory Acceptance Test" (the "FAT").

On July 11, 2020, in response to Defendant suggesting that Plaintiff "source similar test product from somewhere in Europe," Plaintiff caused royal icing from Holland to be delivered to Tecnics in Spain for use in testing the Machine.

On August 12, 2020, Tecnics issued an invoice to Defendant for sale of the Machine in the amount of €180,116.50.

On August 14, 2020, Tecnics completed the FAT on the Machine using Plaintiff's bags/pouches and the royal icing mix that Plaintiff had sourced from Holland. Because of the COVID-19 pandemic, representatives of Plaintiff could not attend the FAT.

After completion of the FAT, Tecnics completed a written report entitled "Internal Verification Protocol" (the "FAT Report"). Tecnics reported the results therein as follows: "Product [r]oyal [i]cing received has been tested without 100% good results. Because following instructions of mixing (1000 gr. Powder + 140 ml water) product was very thick (like concrete) impossible to dose. We have add [sic] extra water +/- 20% been able to test but accuracy was not good." In his deposition, Marzo described

the problem with the icing from Holland as, "[w]e're dealing with a product that changes its characteristics in a very short time."

On August 17, 2020, Tecnics sent the FAT Report to Defendant along with a video (the "FAT Video") of the Machine operating with the icing from Holland that had been mixed with 20% more water than called for in the instructions. Tecnics, through Marzo, also provided the following additional information and statements to Defendant regarding the FAT: "With the product received the weight were [sic] not stable, we mix the product following the instructions and the results was a paste very thick. We add more water in order to make it run. Hopefully final product will be not as thick." Defendant did not inform Plaintiff of these additional statements from Tecnics. In his deposition, Marzo testified that he expected Defendant to send Plaintiff his August 17, 2020 statements. He agreed that his statements were of particular importance because the COVID-19 pandemic prevented Plaintiff from participating in the FAT.

On August 17, 2020, Defendant delivered the FAT Video, but not the FAT Report, to Plaintiff. By watching the FAT Video without first reading the FAT Report, it is not possible to determine that the Machine was operating with icing that had 20% more water added to it. Along with the FAT Video, Defendant sent Plaintiff the following statement: "The machine was tested in the video link below at 45 PPM [pouches per minutes] with the product received from Holland."

In his deposition, Rehm agreed that the FAT Report and the statements Marzo made in his August 17, 2020 email were "valuable information" about the Machine.

On August 19, 2020, Tecnics shipped the Machine to Plaintiff's place of business.

### 2.6    Arrival and Retrofitting of the Machine

The Machine arrived at Plaintiff's place of business on or about August 31, 2020. A Service Engineer for Defendant, Bill Tatay ("Tatay"), arrived at Plaintiff's place of business on September 1, 2020 to power up the Machine, initiate startup, make it operational, and train Plaintiff on how to operate it. After five days of working on the Machine, Tatay could not make the Machine operational and experienced problems operating it using Plaintiff's bags/pouches and its Royal Icing.

Due to the issues Tatay encountered during these five days, Defendant designed a retrofit kit that included a new gearbox, servos with bigger motors, and relocated the fill system and shortened the hoses.

On September 21, 2020, Tatay arrived at Plaintiff's plant where he spent five days performing the retrofit. On September 22, 2020, Tatay wrote an internal email (emphasis added):

> Matt [Rehm],
>
> . . . I showed up at noon as requested. They told me that the machine would be down and ready for me. It was not. In fact, production was not finished until 5:30 PM, then another 2 hours until I could actually start the retrofit. As I was looking at what I needed to do, I realized that after I relocated the dosing system, the airlines were going to be too short. The customer had no 6 mm airline. In fact they had no airline at all, and everything was closed so I could not purchase. Relocating the dosing system didn't happen. At 7:30, we started to install the new gear boxes. When I went to mount the motor to the first gearbox, I found that the existing flange used 6 mm bolts and the new gearbox used 5 mm bolts. Again, the customer did not have. So, I waited 7.5 hours to get to work on the machine, but in the end, did absolutely nothing because I did not have the right stuff! VERY VERY FRUSTRATED!!!!!!! In the morning, I will try to source the airline and bolts locally. If I cannot, I will need to have airline and bolts overnighted from somewhere, and will complete

the retrofit on Thursday. I . . . would not be able to return here for 1 month. PLEASE! When sending a retrofit, we need a COMPLETE kit! The customer NEVER has what is needed. And most times neither do local suppliers. I promise, I will lose a day every time! We are not in a position right not [sic] to lose even hours, and the schedule is getting even tighter. Complete kit means all hardware, valves, etc. Proper sized bolts, nuts, washers, drills, taps, air fittings, airline.

Additionally, I was hoping to get some training done with the operator, however, she was expected to blend the product. Do paperwork, and run the machine. She would disappear for extended periods of time. Luckily the machine didn't do too horribly today. *They need to find stiffer bags which I talked to Lauren about. She has an idea of a different one to try. These poly bags are very thin and flimsy and don't like to stay put in the cassette.*

The following are Tatay's notes regarding his work performed from September 21, 2020 through September 25, 2020:

**Monday**: Arrived to inspect retrofit. Was told I could have the machine at 12 PM on Tuesday to start.

**Tuesday**: Arrived on time, but did not finish production until 5:30 PM then took 2 hours to clean the machine. Started to install gearboxes, and do dosing system relocation. Realized that the new gearboxes were tapped for 5mm bolts, and old flanges were 6mm bolts. Also realized the airlines were not going to reach. Finished having done nothing.

**Wednesday**: Started at 7 AM from my room, attempting to source bolts and 6mm airline. Found everything to be "special order." Matrix sent hardware and bolts overnight. Spent 2 hours shopping. Arrived at customer at 9 AM. Spent the day training with customer, in between batching issues. FL ran decent enough. Operator had to batch, do paperwork, load pouches and transfer pouches. Was difficult when machine running at 22 ppm [pouches per minute].

**Thursday**: Arrived at 7AM to start dosing system relocation. Received airline and hardware from Matrix. Dosing relocation was complete and machine was turned back over

to production at 11:30 AM. Made the decision to wait till early Friday to install gearboxes when Spain could be available to make sure servo program was working correctly. Continue training with the operator.

**Friday**: Arrived at 5:30 AM to change gearboxes. Found one flange with 2 holes drilled incorrectly. Need to send correct flange. Found company laptop WiFi not working. Did program changes and servo zeroing via WhatsApp. Finished by 9:30 AM. Started machine with "normal" viscosity frosting. Servos running MUCH cooler. Sped machine up to 35 ppm [pouches per minute] before finishing for the day. Also found date coder inoperable due to water damage.

General observations: Pouches are poly and arriving bent and wrinkled. VERY difficult to pick up and open. Poly has a VERY tight seal temperature tolerance, making it difficlut [sic] to seal. Customer not checking batch viscosity, thus each batch is different, and thus runs differently. Noticing intermittent dosing nozzle drips, causing seal issues. Believe this to be due to produsct [sic] viscosity issues. (Continued below in "outstanding" issues")

**Outstanding Issues** . . .Believe the onstant [sic] "tweaking" will go away once viscosity Is tested and consistent every batch. Also, higher quality pouches will help drastically. Trained customer to remove date coder head before machine cleaning. Did not happen, coder now inoperable due to water damage, could not test new cartridge.

### 2.7 Continued Issues with the Machine

On September 28, 2020, Plaintiff informed Defendant of the following problems with the Machine:

[W]e had three people operating the machine for just over 10 hours. In this time the machine produced 5,000 bags according to the counter but in reality it was just under 4,000. We had to replace the Teflon on the seals 3 times. We had a supervisor over there dealing with it for 5 hours and maintenance working on it for almost 2 hours. The nozzles drip on every bag causing major issues with the seals. This

also make [sic] a huge mess that is causing us extremely long cleanup times.

On October 1, 2020, Defendant sent Service Engineer Stan Hartley ("Hartley") and Director of Distributed Product Lines Alex Diaz ("Diaz") to Plaintiff's plant to work on the Machine. The following is a summary of Hartley's notes in his Field Service Report:

Thursday [October 1, 2020]: Arrived at 3PM. They were running at 26 BPM & 1 fill station. Checked the machine settings with the settings that [Tatay] gave me and they all looked very close excep [sic] the speed was slower than what [Tatay] had set it to run. I made some adjustments to product weight and was running at 27 CPM. I was getting Axis fault on filler #1. We cleaned the hopper and put new product and this fault was not happening so they ran the rest of the evening at 27.

Friday [October 2, 2020]: Set up computer with Spain. Carles connected and we found that some cables were mixed up on side 1 and side 2 of the fill system. Most of the morning and afternoon was with programmer from Spain. Having trouble with the pouch position and transfer. Left side stack of pouches was loosing [sic] the back edge of the pouch on the pincer dies walking beam made several adjustments and noticed the pouch lifter was hitting hard on the stack of pounches [sic] and sliding them back in holder.

Saturday [October 3, 2020]: On the line with Spain most of the day trying to figure out why the filler motors were alarming after the machine is stopped and restarted. FL/Carles founds [sic] some problems with the recharge of the product in the filler within the PLC. Thanks to Carles he was able to get this fixed and showed me how to adjust the transfer conveyor to the proper position.

Sunday [October 4, 2020]: Worked on pouch transfer and pouch opening. I was able to get the pouch to open but only 50 percent in the opening station cups and 90 percent in the cone blower station. I had to shorten the stroke upon [sic] on the 2 cups in the open station because they keep pulling off the bag. I was able to find a 3rd set of suction cup assembly

that will help hold the bag open in the second fill station. I have no cups for this station I ordered from McMaster Carr they will Arrive Wednesday.

Monday [October 5, 2020]: On line with Spain Because the feed #2 motor was getting to [sic] hot and giving axis fault while machine was on standby without running. The problem was that zero was negative .5 and it was coming back to a hard stop and no room to travel back. Resolved this by 10 AM and started to run product. The product had set up and was way to [sic] thick to run so the batcher added water to get it to move in the Pumps. We finally got it to flow nicely.

Tuesday [October 6, 2020]: Spoke with Christopher about the Reject not stopping the dose on the proper pouch. Christopher was online with the machine at work and after he arrived at home helping me get the register right in the program because it was out of my hands with the screen adjustment. Was able to get this to work after lunch to assemble and lub [sic] them. I drilled out the air jet to blow off product so the air will have very little resistance escaping the nozzles, and this helped with popping.

Wednesday [October 7, 2020]: Called Caleb to check on the production and he told me the machine was down due to the pouch elevator was not rising on the right side. I arrived at the customer and checked this out and the lead screw had icing on it along with the sliding shafts that keep it straight. I cleaned it and lubricated the shafts. Cleaned the cover and installed it.

Started to run product and found 6 of the pincer fingers are stuck inside and some are hard to collapse. I removed them and cleaned them and placed them back on the machine. Started to run production and with the setpoint at 140 on both sides of the fill settings I was getting punches at 3.3 to 3.7 oz. They need 4.5 to 6 oz to be shipped. They made a new batch and placed it in the hopper and weights were 8.7 to 9.5 with just the change of product. I showed the owner Lauren[.]

On October 3, 2020, Diaz drafted an internal report stating the following observations: "[Plaintiff's] Royal Icing 'changes by the minute. If

you leave it to [sic] long it creates a crust that it's [sic] impossible to run and clogs up hoses and nozzles;' the Pick and Place is 'too inconsistent. Does not deliver the bags in the walking bean [sic] in a consistent manner. Stan is constantly changes [sic] gripper locations and making other adjustments. Having issues opening the bags and mostly maintaining the bags open;' in regards to the Magazine 'bag moves, they are not in the same position when you look at right vs. left magazine, no pressure to hold the tip down and as it picks the bag' it 'slides all over the place.'" He also stated at that time that "we need consistent product. And this needed to be tested at [Tecnics]. I strongly think we do not have the right filler. We may need a toothpaste filler or a company that specializes on filling frosting" and "we need major improvement to infeed, pick and place. Additionally for this type of bags we needed a carrousel [sic] instead of a walking beam. These bags are too flimsy and should have been called out early."

On October 4, 2020, Diaz drafted another email again summarizing the repairs, adjustments, and work performed on the Machine and stating the following: "Talked about the inconsistency of the product and how that is preventing us from running faster and consistently . . . ," "Suggested we should heat the hopper and they agree this would make the product flow better," "We have to [sic] many issues to address. At this point, I think we need Engineers from Spain (programming and mechanical) to get this machine to work. The time difference and them not seeing directly the issues has hindered progress," and "Problem points continue to be: Infeed—Does not work well with the flimsy bags—Not sure how [Tecnics] was able to run them at their facility. Why we suggest they come onsite. Filling station—Both Nozzle programming, design, etc—They need to see what the nozzles are doing and program live . . . Product Consistency—Not

sure if we will overcome this—They batch as needed and if the machine worked consistently, they can get into a groove. But machine is nowhere close to being there."

Following continued troubleshooting of the Machine, Lauren continued to express her dissatisfaction and emphasized the urgency of the situation. On October 11, 2020, she wrote to Diaz and Rehm that "our product is forever changing because your machine does not work. Our product hardens overtime [sic] and we can't pack it fast enough and your team is asking us to make it ruiny [sic] because your machine can [sic] run out product so it will never be consistent with a machine like this!!!!"

From September 1, 2020 through November 2020, Defendant was in constant contact with Tecnics and Marzo, who assisted with adjustments, repairs, retro kits, and modifications. On November 16, 2020 and November 18, 2020, the parties discussed returning the Machine back to Matrix under certain terms and conditions that the parties could not agree upon.

In his deposition, Marzo testified that the problems Defendant was having with the Machine at Plaintiff's plant and with Plaintiff's Royal Icing were the "same problems . . . Tecnics experienced with the Machine during the manufacturing and testing stage using the [r]oyal [i]cing from Holland." He testified the following regarding the FAT Report and the expectation that Plaintiff would receive a copy of the FAT Report:

> Q: Okay. And whether the customer comes to the facility to see the FAT test being performed or not, do they receive a copy of the FAT test report?
>
> A: Normally, regarding the FAT documentation, the first person who has an interest in having this carried out is normally the client itself, the end user, that is, and there's normally a type of FAT draft. And there are smaller companies who aren't multi-nationals, and they're not used to this process. For them, we have a—well, we have a

standard FAT document, which is the one we fill out to make sure the machine is meeting the conditions of the offer in the original contract. And in this case an F-A-T or FAT document was drawn up, we filmed some videos, and all of this information was sent on to [Defendant].

Q: And was it send to [Defendant] with the expectation that it would be delivered to [Plaintiff]?

A: Exactly.

Marzo also testified that but for the COVID-19 pandemic, Plaintiff would have been invited to Tecnics' place of business to observe and participate in the FAT. He testified that if Plaintiff had been at the FAT, Plaintiff would have had an opportunity to request that additional modifications be made to the Machine before accepting it; would have had an opportunity to observe the icing from Holland and the difficulties the Machine had with it; to the extent the icing was not mixed to the same consistency as Plaintiff's product, would have had the opportunity to mix the icing from Holland to the same consistency as its own; would have had an opportunity to observe the FAT Report being completed and/or the opportunity to complete the FAT Report itself; and if Plaintiff was not satisfied with the Machine, would have had an opportunity to not accept it or to ask Tecnics to build another machine capable of operating with Plaintiff's Royal Icing.

Rehm, in his deposition, testified that the FAT was not conducted properly because Plaintiff could not attend: "Without a proper FAT test, the customer was unable to truly validate the equipment prior to shipment. That is the big issue. Because of COVID, the travel was restricted at the time. You could not get the customer in front of the machine to verify that the machine is producing their product." He also testified that under a proper FAT, the Machine would not have left Tecnics' place of business without Plaintiff seeing it first.

In his deposition, Snader, when asked whether Plaintiff "was entitled to receive a copy of t[he] [FAT]" responded: "I would say—I would say probably. Yes."

On October 11, 2020, the parties exchanged emails discussing issues and next steps. Defendant continued to provide upgraded parts to the Machine throughout October 2020, at no additional cost to Plaintiff.

Plaintiff initiated suit on March 16, 2021. Plaintiff alleges it suffered economic damage in an amount exceeding $1,000,000, but Defendant disputes this amount. Plaintiff retains possession of the Machine. Plaintiff purchased another machine to pump its Royal Icing from Defendant's competitor, Schur, but Plaintiff ultimately rejected the Schur machine.

**3.     SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party

and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005).

Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). But simply "denying a fact that has evidentiary support 'does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.'" *Uncommon v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (citation omitted).

## 4.    ANALYSIS

### 4.1    Breach of Contract Claim

Plaintiff's first remaining claim is for breach of contract. ECF No. 51 at 9–11. Plaintiff moves for summary judgment on this claim. ECF No. 110. Defendant purports to move for partial summary judgment on this claim. ECF No. 104.[6]

#### 4.1.1   The Parties' Arguments

Defendant argues that no breach of contract occurred because it is undisputed that the Machine was built specifically for Plaintiff, was

---

[6] The first part of Defendant's motion, ECF No. 104, addresses the liability portion of breach of contract. ECF No. 105 at 4. It is therefore properly addressed in this section. The second part of its motion asserts that "[e]ven if Matrix did breach the Contract, [Plaintiff's] damages are contractually limited," and seeks summary judgment "to the extent that [Plaintiff's breach of contract] claim seeks recovery of damages above the purchase price" and requests "that the Court enforce the limitation of liability clause of the Terms and Conditions governing the parties' Contract." ECF No. 105 at 1, 5. The latter part of this motion is better addressed, therefore, in the Limitation on Damages section below, together with Plaintiff's motion for summary judgment "on Defendant's Affirmative Defense of Limitation of Damages," ECF No. 112.

delivered to Plaintiff, was retrofitted for Plaintiff's needs, and is still retained by Plaintiff. ECF No. 105 at 4. Accordingly, Defendant argues that it "material[ly] compli[ed] with the Contract's terms, which excuses any immaterial breach." *Id*.

In contrast, Plaintiff argues that Defendant delivered to Plaintiff a machine that "could not operate at the Contract specifications" and could not "operate with [Plaintiff's] Royal Icing" and its "bags," thereby breaching the Contract. ECF No. 111 at 8, 10, 12 ("[T]he Machine was not properly designed to operate with [Plaintiff's] Royal Icing."), at 15, and at 18 ("[Defendant] had [Plaintiff's] Bags in its possession prior to formation of the Contract and prior to commencement of the design and manufacturing of the Machine, yet [Defendant] delivered the Machine with design defects that prevented it from operating with [Plaintiff's] Bags."). Plaintiff also argues that Defendant breached the Contract when Defendant "asked [Plaintiff] to source similar royal icing product in Europe." *Id*. at 18–19. Additionally, Plaintiff argues that it is a third-party beneficiary to the Offer between Tecnics and Defendant and that Plaintiff may therefore "bring suit for a breach of that contract and recover damages therefor." *Id*. at 22 (citation omitted).

### 4.1.2   Breach of Contract as a General Matter

"A breach of contract claim requires proof of three elements: (1) a contract between the plaintiff and the defendant; (2) failure of the defendant to do what it undertook to do; and (3) damages. *Koehne Chevrolet-Buick-GMC, Inc. v. Bayland Bldgs., Inc.*, 963 N.W.2d 581, ¶ 9 (Wis. Ct. App. 2021) (citing *Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 714 N.W.2d 582, ¶ 11 (Wis. Ct. App. 2006)). The parties do not dispute that they are bound to the Contract and its T&Cs. Nor do the parties dispute that, in the event

Case 2:21-cv-01399-JPS   Filed 08/02/23   Page 22 of 69   Document 133

of a breach, damages in some disputed amount are due. The Court must therefore first focus on the second element—whether Defendant "fail[ed] . . . to do what it undertook to do." *Id.*

### 4.1.3   Material Versus Immaterial Breach

"[S]ome measure of nonperformance or defective performance of a contract will be tolerated if the other party received, with minor deviations, what it bargained for." *Blackhawk State Bank v. Fiserv, Inc.*, 712 N.W.2d 86, ¶ 18 (Wis. Ct. App. 2006) (citing Wis. J.I.—Civil 3052).

In contrast, "[a] breach of contract is material when it is so serious as to destroy the essential object of the contract." *Id.* (citing *Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 77 (Wis. 1996)). "Whether a breach is material presents a question of fact." *Id.* (citing *Shy v. Indus. Salvage Material Co.*, 58 N.W.2d 452, 456 (Wis. 1953); *Myrold v. N. Wis. Co-op. Tobacco Pool*, 239 N.W. 422, 424 (Wis. 1931) ("Whether or not there is a material breach is, except in clear cases, a question for the jury."). "Whether a breach is material involves the consideration of several factors, 'including the extent to which the injured party will be deprived of the benefit that he or she reasonably expected, and the extent to which the injured party can be adequately compensated for his or her loss.'" *King v. Niederkorn*, 983 N.W.2d 218, ¶ 28 (Wis. Ct. App. 2022) (quoting Restatement (Second) of Contracts §§ 241, 242 (Am. Law. Inst. 1981)). Also relevant is "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Id.* (quoting Restatement (Second) of Contracts § 241). The standards of good faith and fair dealing arise out of a disfavor for "following the letter but not the spirit of an agreement." *Runzheimer Int'l,*

*Ltd. v. Friedlen*, 862 N.W.2d 879, ¶ 54 (Wis. 2015) (quoting *Beidel v. Sideline Software, Inc.*, 842 N.W.2d 240, ¶ 27 (Wis. 2013)).

The inquiry of whether a breach is material or immaterial is therefore necessarily intertwined with the inquiry of what the "essential object" or "objects" of the contract are. *Id.*; *King*, 983 N.W.2d, ¶¶ 13, 25 (citing *Appleton State Bank v. Lee*, 148 N.W.2d 1, 2–3 (Wis. 1967) ("In determining whether a breach of contract is material, a contract can indeed have more than one essential object or purpose.")).

A reasonable juror could find that Defendant materially breached the Contract in this case when Defendant provided Plaintiff the Machine, which was incapable of functioning properly and consistently with Plaintiff's polyethylene bags and non-watered-down icing. Plaintiff reasonably expected that it would receive a machine that would enable it to more efficiently package its Royal Icing in its polyethylene bags/pouches. It is undisputed that Plaintiff sought to "find[] a machine that could automate the filling of its Royal icing into its triangular premade polyethylene bags," ECF No. 102 at 2, and that Plaintiff contracted for such machine to be capable of filling an estimated 25 to 40 pouches per minutes ("PPM"), ECF No. 102-10 at 4. It is also undisputed that the Contract called for the use of a "[p]re-made pouch," ECF No. 102-10 at 4; that Plaintiff utilized a polyethylene pouch; that Defendant was aware, prior to entering into the Contract, that Plaintiff used a polyethylene pouch; that Plaintiff sent samples of its polyethylene pouches to Defendant prior to the Machine's construction and prior to execution of the Contract; and that at no point did Defendant inform Plaintiff prior to construction of the Machine that Plaintiff needed to use a different type of pouch.

Despite all this, the Machine that Defendant caused to be delivered to Plaintiff was, unbeknownst to Plaintiff, not at all suitable for use with Plaintiff's polyethylene pouches and, as Plaintiff would come to discover, could not *consistently* fill an estimated 25 to 40 polyethylene pouches with non-watered-down icing per minute as bargained for in the Contract.[7] It is undisputed that the FAT results were "not good" and that the use of the Machine was "impossible" until Tecnics decided, again unbeknownst to Plaintiff, to water down the test product by 20%. ECF No. 102 at 10.[8] Notwithstanding those results, Defendant sent the machine to Plaintiff anyway, having every reason to suspect that the Machine very likely would not function appropriately with Plaintiff's non-watered down Royal Icing and with Plaintiff's polyethylene bags.[9] Indeed, that is exactly what

---

[7]Defendant claims that it materially complied with the Contract in part because when the Machine left Tecnics' facility, it was able to operate within or even beyond the estimated PPM. *See* ECF No. 126 at 3. But the parties' agreed upon facts do not allow for the conclusion that the Machine was ever consistently—with non-watered-down icing—able to maintain stats within the expected range. At one point, Tatay records that he "sped machine up to 35 ppm," but he does not indicate how long the Machine ran at such speed or how many bags were ultimately filled. ECF No. 102 at 13.

[8]Defendant's assertion that the Machine "worked when it left the manufacturer's factory" is a highly questionable and disingenuous characterization. ECF No. 119. Mere days before the Machine left Tecnics' facilities in Spain, testing of the Machine demonstrated poor "accuracy" and a lack of "100% good results." ECF No. 102 at 10. Tecnics and Marzo at that time expressed concern about the operability of the Machine with the consistency of the test product sent by Plaintiff. The Machine only "worked," to the extent it can even be described as such, because Tecnics significantly altered the composition of the test product icing by watering it down, contrary to the icing's "instructions." *Id.* at 11.

[9]Defendant insists that "[t]he Machine was able to process [Plaintiff's] poorly constructed bags," ECF No. 119 at 10, but that conclusion is belied by the parties' agreed upon statement of facts, which leads the reader to the inescapable conclusion that the Machine could not, in fact, effectively process the polyethylene bags. *See* ECF No. 102 at 6 (Tecnics communications to Defendant that "this type of pouches [sic] can no run on the machine," "cannot be guided straight on the

happened—the Machine was not "operational" following delivery, even after "five days of [Tatay] working on it," ECF No. 102 at 12, and for several months thereafter it required near constant maintenance and retrofitting, caused repeated delays, and was described by Defendant's own Director of

---

pouch magazine," and "cannot be sealed on our machine with the standard sealing jaws," and reiterating again later that Tecnics "doubt[s] [it] can run this type of material and pouch in our machines"), at 12 (Tatay email to Defendant stating that Plaintiff "need[s] to find stiffer bags" because the "poly bags are very thin and flimsy and don't like to stay put in the cassette"), at 15–16 (Diaz internal report stating that the Machine's pick and place "[d]oes not deliver the bags in the walking bean [sic] in a consistent manner" and is "[h]aving issues opening the bags and mostly maintaining the bags open," noting also that "for this type of bags we needed a carrousel [sic] instead of a walking beam" and that "[t]hese bags are too flimsy and should have been called out early").

Additionally, in support of the proposition that it "repetitively and consistently expressed to [Plaintiff] that . . . polyethylene bags are not an ideal choice because they are flimsy and do not hold their shape," Defendant cites to paragraph 9 of the parties' agreed upon statement of facts. ECF No. 119 at 10. Paragraph 9 states that "On September 19, 2019, Matrix, through Spencer Johnson, contacted FL Tecnics to inquire about what kind of machines it could manufacture to fill Bakery Bling's Royal Icing into its triangular premade bags." ECF No. 102 at 2. Needless to say, that statement does not provide any support whatsoever for the proposition for which Defendant cites it. Nor can the Court find in the agreed upon statement of facts any support for the proposition.

Then, in its brief in support of its motion for summary judgment on Plaintiff's intentional representation claim, Defendant again asserts that Plaintiff "continued to use flimsy icing bags, a problem identified by [Defendant] to [Plaintiff] before [Plaintiff] ultimately accepted." ECF No. 109 at 9. In support of that assertion, Defendant cites to paragraph 17 of the parties' agreed upon facts, which provides only that "[o]n October 15, 2019, [Tecnics], through [Marzo], informed [Defendant] that [Plaintiff's] polyethylene triangular bag 'looks very thin and probably will not be the good one to work' with its machine . . . . Johnson of [Defendant] replied [Plaintiff] was 'open to change . . . .'" Again, this paragraph does not support the assertion for which it is cited. It demonstrates that Tecnics informed *Defendant* that the bags were unsuitable, but it does not provide that anyone ever conveyed that to *Plaintiff*. And it demonstrates that Defendant *represented to Tecnics* that Plaintiff would be willing to use another bag, but it does not demonstrate that Plaintiff ever actually so indicated.

Distributed Product Lines as having "to [sic] many issues to address."[10] *Id.* at 16 (Diaz also noting that intervention from Tecnics in Spain would be needed to "get this machine to work").

In light of all this, a reasonable juror could conclude that Defendant—the party "failing to perform"—did not "comport[] with standards of good faith and fair dealing," *King,* 983 N.W.2d, ¶ 28 (quoting Restatement (Second) of Contracts § 241), and could conclude that Defendant "deprived [Plaintiff] of the benefit that [it] reasonably expected." *Id.* In other words, a reasonable juror could conclude the breach was material.

Having so concluded, the real question is whether a reasonable juror could find that Defendant did *not* materially breach the Contract, and whether this is therefore one of those "clear cases" in which this question can be removed from the jury. *Myrold,* 206 Wis. at 249. Put otherwise, can the Court conclude based on the record now before it that breach of contract occurred as a matter of law? Even viewing the parties' submissions in the light most favorable to Defendant, as the Court must, the Court concludes that Plaintiff is entitled to judgment as a matter of law on its breach of contract claim. No reasonable juror could find that breach of contract was not committed when Defendant provided Plaintiff a Machine that was inherently incapable of consistently performing as contracted for. Based on

---

[10]Defendant insists that any inoperability of the Machine was, *inter alia*, attributable to Plaintiff's lack of competent personnel to operate it, clean it, and maintain it following its delivery. ECF No. 119 at 8. But as the Court has discussed, the Machine arrived at Plaintiff's facilities already incapable of properly functioning with Plaintiff's polyethylene bags and with non-watered-down icing—i.e., the Machine was unsuitable before Plaintiff ever even put its hands on it. Whether Plaintiff had a "trained Machine operator" makes no difference when the machine to be operated is itself essentially incompatible with the product and bags to be used in conjunction with it. *Id.* at 9.

the undisputed facts before the Court, no reasonable juror could conclude that Defendant did "what it undertook to do." *Koehne Chevrolet-Buick-GMC, Inc.*, 963 N.W.2d, ¶ 9. That was the sole element at issue, and there is no genuine dispute of material fact with respect to it.[11]

Accordingly, Plaintiff's motion for summary judgment on its breach of contract claim, ECF No. 110, will be granted, and Defendant's motion for partial summary judgment on Plaintiff's breach of contract claim, ECF No. 104, will be denied with respect to liability, with the separate issue of damages limitations to be addressed *infra*.

### 4.2    Intentional Misrepresentation Claim

Plaintiff also raises a claim for intentional misrepresentation.[12] ECF No. 51 at 12–13. The parties cross move for summary judgment on this claim. ECF Nos. 108, 114.

---

[11]Having so concluded, the Court need not address Plaintiff's alternative arguments in support of its motion for summary judgment on its breach of contract claim—for example, that Defendant breached the contract when it asked Plaintiff to source similar icing product from Europe. *See* ECF No. 111 at 18–19.

[12]Although the amended complaint lists the claim as one of intentional "and/or fraudulent" misrepresentation, ECF No. 51 at 12–13, the parties' final pretrial report (and Plaintiff's briefing on the claim) refer to this claim as one solely of "Intentional Misrepresentation." ECF No. 89 at 3; *see generally* ECF No. 114. The difference appears to be immaterial, as a "claim . . . for intentional misrepresentation [is] sometimes referred to as fraudulent misrepresentation . . . ." *Kaloti Enters. v. Kellogg Sales Co.*, 699 N.W.2d 205, ¶ 12 (Wis. 2005) (citing *Ramsden v. Farm Credit Servs. of N. Cent. Wis. ACA*, 590 N.W.2d 1, 7 n.9 (Wis. Ct. App. 1998)). The parties stipulate to the elements of that claim as: "a. Defendants [sic] made a representation of fact; b. The representation was not true; c. Defendants [sic] knew the representation was not true; d. Defendants [sic] made the misrepresentation with the intent to deceive Plaintiff; e. Plaintiff believed the representation was true and relied on it; and f. Plaintiff did not know and should not have known the representation was untrue." ECF No. 89 at 41.

Case 2:21-cv-01399-JPS    Filed 08/02/23    Page 28 of 69    Document 133

### 4.2.1 Intentional Misrepresentation Elements

In Wisconsin, the elements of intentional misrepresentation are as follows:

> (1) [T]he defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

*Kaloti Enters.*, 699 N.W.2d, ¶ 12 (quoting *Ramsden*, 590 N.W.2d at 8–9). "An intentional misrepresentation claim may arise either from a 'failure to disclose a material fact' or from a 'statement of a material fact which is untrue.'" *Id.*, ¶ 13 (quoting *Ramsden*, 590 N.W.2d at 5).

### 4.2.2 Duty to Disclose Required for Omission to be Actionable

"A person in a business deal must be under a duty to disclose a material fact before he can be charged with a failure to disclose." *Id.* (quoting *Southard v. Occidental Life Ins. Co.*, 142 N.W.2d 844, 848 (Wis. 1966)). "When there is a duty to disclose a fact, the law has treated the failure to disclose that fact as 'equivalent to a representation of the nonexistence of the fact.'" *Id.* (quoting *Hennig v. Ahearn*, 601 N.W.2d 14, 22 (Wis. Ct. App. 1999)).[13]

---

[13]Defendant's brief in support of its motion for summary judgment on this claim fails to acknowledge that intentional misrepresentation can be shown through a failure to disclose—i.e., an omission. And in its opposition to Plaintiff's motion on the same claim, Defendant argues that the duty to disclose, as discussed in *Ollerman v. O'Rourke*, 288 N.W.2d 95 (Wis. 1980), "involved a residential real estate transaction" and therefore "does not apply to the facts of this case." ECF No. 121 at 4–5. But this Court acknowledged in *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS, 2019 U.S. Dist. LEXIS 109550, at *15–16 (E.D. Wis. July 11,

Relevant to determining whether a party has a duty to disclose a fact are "[t]he hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall." *Id.*, ¶ 16 (quoting *Ollerman*, 288 N.W.2d at 101). "In the end the court will decide whether there is a duty on the basis of the mores of the community." *Id.*

Wisconsin courts have determined that

a party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Id.*, ¶ 20. As relevant to the fourth element, "[t]here is a reasonable expectation of disclosure when taking advantage of a party's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling in which the party is led by appearances into a bargain that is a trap of whose essence and substance he is unaware." *JBCB, LLC v. McKenna Berry Co., LLC*, 909 N.W.2d 210, ¶ 18 (Wis. Ct. App. 2017) (citing *Hennig*, 601 N.W.2d at 21–23).

Plaintiff argues that Defendant made the following omissions (the "Omissions") which amounted to intentional misrepresentations:

---

2019) that while *Ollerman* did not address whether "the duty to disclose should be applied 'more broadly to sales of consumer goods,'" "[n]evertheless, post-*Ollerman* . . . cases provide quite broad descriptions of the duty to disclose," and accordingly applied the duty to disclose to the context of goods. (citations omitted).

- **October 15, 2019:** Marzo told Defendant that "the film looks very thin and probably will not be good one to work on a Premade pouch machine."

- **February 27, 2020:** Marzo told Defendant that Tecnics was "worr[ied] about the dosing" because the product they were seeing "is very thick and compact and we don't know how be [sic] the final one."

- **March 19, 2020:** Marzo told Defendant that Plaintiff's polyethylene bags "will not work on the machine as well as the triangular shape, pouch should have straight square parts on the top, if it is completely triangular also will be not possible to get it run [sic] because no way to keep the pouches straight on the conveyor magazine."

- **April 20, 2020:** After receiving 300 empty polyethylene bags from Plaintiff to use for testing, Marzo told Defendant, "[a]s we were afraid this type of pouches can no [sic] run on the machine . . . . Please explain and inform Customer about this."

- **May 4, 2020:** Marzo reiterated to Defendant that "after been [sic] reviewed by engineering and as I explain on my previous email we doubt we can run this type of material and pouch in our machines. We will need minimum a side seal which is not on the samples."

- **July 8, 2020:** Marzo told Defendant that "[r]egarding product we already try and purchase something we thought was similar (Frosting) and what we receive [sic] was impossible to be dose [sic] as it was too thick . . . . [L]et know Customer that we cannot be responsible if after when the machine is install [sic] the final product does not work as it should."

- **August 17, 2020:** Marzo reported in the FAT Report that "Product [r]oyal [i]cing received has been tested without 100% good results. Because following instructions of mixing (1000 gr. powder + 140 ml water) product was very thick (like concrete) impossible to dose. We have add [sic] extra water +/- 20% been able to test but accuracy was not good."

- **August 17, 2020:** Marzo additionally reported to Defendant that "[w]ith the product received the weight were [sic] not stable, we mix the product following the instructions and the results was a paste very thick. We add more water in order to make it run. Hopefully final product will not be as thick."

- **August 17, 2020**: Marzo sent the FAT Video to Defendant showing the Machine operating with the icing sourced from Holland that had been mixed with 20% more water than called for in the instructions.

ECF No. 115 at 4–6 (citations omitted).

The Court must now analyze whether Defendant had a duty to disclose any of the alleged Omissions to Plaintiff. First, the Court concludes that a reasonable juror could conclude that at least some, if not all, of the above Omissions were material to the transaction. Perhaps one of the most material omissions was that the icing used to test the machine in the FAT was, unbeknownst to Plaintiff, watered down by 20% contrary to its instructions. Plaintiff, on Defendant's suggestion, had sent Tecnics a similar icing from Holland to test the Machine, since customs requirements disallowed Plaintiff's own Royal Icing from being shipped to Spain. ECF No. 102 at 9. Common sense allows for the reasonable inference that Plaintiff sourced this particular product because of its similarity to its own Royal Icing. Unbeknownst to Plaintiff, the test icing in its called-for form was too thick for use in the Machine. *Id.* at 10. The fact that the similar test product (in its proper, non-watered-down version) could not properly run through the Machine was material to the transaction because it indicated that the Machine would similarly be unsuitable for dosing Plaintiff's own Royal Icing.

The second required element is that "the party with knowledge of that fact knows that the other party is about to enter into the transaction

under a mistake as to the fact." *Kaloti,* 699 N.W.2d, ¶ 20. That element is also met here. Plaintiff, before and during the business relationship with Defendant, used its own Royal Icing and its polyethylene bags for its kits. That fact never changed and was known by Defendant both before and during its contractual relationship with Plaintiff. The circumstances here indicate that Plaintiff fully and reasonably expected to be able to use the Machine in conjunction with Plaintiff's Royal Icing and its polyethylene bags and that Defendant knew this. But Defendant also had every reason to suspect that the Machine would not, in fact, function properly and as contracted for with Plaintiff's non-watered-down icing and its polyethylene bags.

The third element for a duty to disclose to arise is that "the fact is peculiarly and exclusively within the knowledge of one party." *Kaloti,* 699 N.W.2d, ¶ 20. That element is also indisputably met. Contrary to Defendant's mischaracterizations in its briefing,[14] Defendant at no point prior to delivery of the Machine appears to have told Plaintiff that the polyethylene bags would be unsuitable for use with the Machine. *See* ECF No. 102 at 6 (noting as undisputed that Marzo repeatedly warned Defendant that the Machine did not run properly with the polyethylene pouches and noting that Defendant "did not inform [Plaintiff] of this information or these statements"). It is also undisputed that Plaintiff was not informed, and was provided the FAT Video through which Plaintiff could not discern, that the Machine was only able to dose product during the FAT because the composition of the test product was altered contrary to its instructions. *See id.* at 11 (Marzo informing Defendant that Tecnics "add[ed] more water in order to make it run" and stating that "[h]opefully

---

[14] *See supra* note 9.

final product will be not as thick," noting that Defendant did not convey this information to Plaintiff, and noting that the FAT Video did not allow the viewer to determine that the test icing was watered down).

The above information was also exclusively within Defendant's knowledge because Defendant was getting this information from Tecnics, with whom it had a working relationship, but with whom Plaintiff had no interaction or contact. The channels of communication were such that Defendant existed as the middleman of sorts, communicating with Tecnics about the Machine and passing along to Plaintiff some—but critically, not all—of the material information relating thereto. *See id.* at 2–4 & 7–9 (noting that Defendant communicated with Tecnics through Johnson and/or Rehm and that Johnson and/or Rehm were Plaintiff's point(s) of contact for the transaction).

Lastly, for Defendant to have a duty to disclose, Plaintiff must show that "on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact." *Kaloti*, 699 N.W.2d, ¶ 20. A showing that "the party is led by appearances into a bargain that is a trap of whose essence and substance he is unaware" is relevant to this element. *McKenna Berry Co., LLC*, 909 N.W.2d, ¶ 18 (citing *Hennig*, 601 N.W.2d at 21–23).

This element is met. Plaintiff would reasonably expect Defendant to inform Plaintiff that the Machine would not function properly with non-watered-down icing and with polyethylene bags because Defendant knew from the beginning that such use was the entire purpose of the Contract. *See* ECF No. 102 at 2 (acknowledging as undisputed that Defendant, through Johnson, contacted Tecnics "to inquire about what kind of

machines it could manufacture to fill [Plaintiff's] *Royal Icing into its triangular premade bags*") (emphasis added).

That reasonable expectation was reinforced when Plaintiff sourced similar icing product from Holland and provided its polyethelene bags to test the Machine, and when thereafter Defendant made no indication to Plaintiff that there was any issue using the icing and bags Plaintiff provided. To the contrary, not only did Defendant not give Plaintiff any indication that there was any issue using the icing and bags Plaintiff provided, but Defendant also actively reassured Plaintiff with the half-truth that "[t]he machine was tested . . . at 45 PPM with the product received from Holland." ECF No. 102 at 11. And by failing to also send Plaintiff the FAT Report, Defendant ensured that its half-truth would not be discovered by Plaintiff. The reality, undisclosed to Plaintiff, was that the FAT was manipulated by altering the test product Plaintiff had sourced, and Defendant misled Plaintiff into thinking the Machine was able to handle the test product in its called-for form by stating simply that the FAT was completed using the "product received from Holland." *Id*. Certainly Tecnics *did* use the test product sourced from Holland, but it used an altered version of it—a version watered down by 20%.

On several occasions, the statement of undisputed facts provides that Defendant conveyed to Tecnics that Plaintiff might be willing to change its bag to a non-polyethylene one, *see id.* at 3–4, but this alleged willingness from Plaintiff's point of view, or expressed by Plaintiff itself, is not reflected in the statement of undisputed facts.

In light of the foregoing, the Court concludes that Defendant had a duty to disclose to Plaintiff that the Machine was not suitable for use with non-watered-down icing and polyethylene bags. Applying the remaining

elements to state a claim for intentional misrepresentation under Wisconsin law, *see Kaloti Enters.,* 699 N.W.2d, ¶ 12, Defendant failed to disclose this information to Plaintiff at multiple junctures, contrary to Marzo's and Tecnics' directive that Defendant "explain and inform Customer about this" because, in part, it was "very important to let know [sic] Customer that [Tecnics] cannot be responsible if . . . the final product does not work as it should." *See id*. at 6, 8. Plaintiff justifiably relied on not only the lack of warnings conveyed to it from Defendant, but also on the above-discussed half-truth Defendant proffered about the FAT, when Plaintiff went forward with the transaction without requesting modifications or further testing.

### 4.2.3   Economic Loss Doctrine

However, the Court must also address Defendant's argument that the "economic loss doctrine prohibits [Plaintiff's] recovery for intentional misrepresentation." ECF No. 109 at 9.

"The economic loss doctrine is a judicially created rule . . . [that] preclud[es] contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Kaloti,* 699 N.W.2d, ¶ 27 (citations omitted). "The economic loss doctrine is 'based on an understanding that contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial area.'" *Id*., ¶ 28 (quoting *Tietsworth v. Harley-Davidson, Inc*., 677 N.W.2d 233, ¶ 26 (Wis. 2004)). "[I]ts purpose is to preserve the distinction between contract and tort by requiring transacting parties to pursue only their contractual remedies when asserting an economic loss claim." *Id*. (citing *Ins. Co. of N. Am. v. Cease Elec. Inc*., 688 N.W.2d 462, ¶ 24 (Wis. 2004)).

"For purposes of the economic loss doctrine, [Wisconsin courts] have defined 'economic loss' as 'damages resulting from inadequate value because the product is inferior and does not work for the general purposes for which it was manufactured and sold.'" *Id.*, ¶ 29 (quoting *Daanen & Janssen v. Cedarrapids, Inc*, 573 N.W.2d 842, 845 (Wis. 1998)). "Recovery for 'economic loss' refers to recovery as a result of a product failing in its intended use, . . . or failing to live up to a contracting party's expectations . . . ." *Id.* (citations omitted). It "does not include personal injury or damage to other property." *Id.* Put otherwise, the economic loss doctrine provides that "when contractual expectations are frustrated because of a defect in the subject matter of the contract and the only damages are economic losses, the exclusive remedy lies in contract." *Grams v. Milk Prods., Inc.*, 685 N.W.2d 172, ¶ 18 (Wis. Ct. App. 2004) (citing *Bay Breeze Condo. Ass'n Inc. v. Norco Windows, Inc.*, 651 N.W.2d 738, ¶ 9 (Wis. Ct. App. 2002)).

The Wisconsin Supreme Court in *Kaloti* noted that "the economic loss doctrine bars misrepresentation claims based in negligence . . . and strict responsibility," but it noted further that it was at that time "[un]decided whether and to what extent the economic loss doctrine bars claims for fraud in the inducement." *Kaloti,* 699 N.W.2d, ¶ 30 (citation omitted). The court ultimately held "that a fraud in the inducement claim is not barred by the economic loss doctrine" specifically "where the fraud is extraneous to, rather than interwoven with, the contract." *Id.*, ¶ 42 (quoting *Digicorp, Inc. v. Ameritech Corp.*, 662 N.W.2d 652, ¶ 47 (Wis. 2003) and citing *Huron Tool & Eng'g Co. v. Precision Consulting Servs.*, 532 N.W.2d 541, 545 (Mich. Ct. App. 1995)). Plaintiff argues that this exception applies

such that the economic loss doctrine does not bar this claim. ECF No. 125 at 20–21. The Court disagrees.

"Liability for fraud in the inducement requires that the five elements of an intentional misrepresentation claim for relief, as discussed above, are satisfied, and in addition, that the misrepresentation has occurred *before* contract formation." *Kaloti,* 699 N.W.2d, ¶ 30 (emphasis added) (citing *Digicorp, Inc.,* 662 N.W.2d, ¶ 52). Moreover, the plaintiff must also show that "the fraud [was] extraneous to, rather than interwoven with, the contract." *Id.,* ¶ 42 (quoting *Digicorp, Inc.,* 662 N.W.2d, ¶ 47). "Or stated another way, [that] the fraud concerns matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract." *Id.* (citing *Digicorp,* 662 N.W.2d, ¶ 47, *Huron Tool,* 532 N.W.2d at 545, and *Raytheon Co. v. McGraw-Edison Co., Inc.,* 979 F. Supp. 858, 872 (E.D. Wis. 1997)).

The Court has already concluded that Plaintiff has demonstrated "the five elements of an intentional misrepresentation claim." *Id.,* ¶ 30. But the Court cannot conclude that "the fraud [was] extraneous to, rather than interwoven with, the contract." *Id.,* ¶ 42 (quoting *Digicorp, Inc.,* 662 N.W.2d, ¶ 47). To the contrary, the precise opposite is true here.

In *Kaloti,* the Wisconsin Supreme Court concluded that the economic loss doctrine did not bar the plaintiff's claim because the intentional misrepresentation alleged there was "extraneous to, not interwoven with, the contract" because it "d[id] not concern [the relevant parties'] performance of the contract, and it d[id] not regard the quality or character of the [products] that [Defendant] sold [Plaintiff]." *Id.,* ¶ 45. The court reiterated that "[m]atters that are expressly or implicitly dealt with in the

contract, such as the performance or the quality or character of the goods sold, still must be addressed by contract law." *Id.*, ¶ 46.

The intentional representation alleged here is indisputably interwoven with, rather than extraneous to, the Contract. The intentional misrepresentation at issue concerns the quality and character of the Machine, and the damages Plaintiff seeks are alleged to be "a result of a product [the Machine] failing in its intended use." *See id.*, ¶ 29 (citing *Daanen*, 573 N.W.2d at 846–47). No reasonable juror, nor this Court, could conclude that the intentional misrepresentation demonstrated here "concerns matters extraneous to the contract's terms." *See id.*, ¶ 49.

In light of the foregoing, Plaintiff's intentional misrepresentation claim is barred by the economic loss doctrine. The Court is therefore constrained to deny Plaintiff's motion for summary judgment on its intentional misrepresentation claim, ECF No. 114, and grant Defendant's motion on the same, ECF No. 108.

### 4.3 WDTPA Claim

Lastly, Plaintiff brings a claim for violation of the WDTPA.[15] The parties again bring cross motions for summary judgment on this claim. *See* ECF Nos. 106, 116.

#### 4.3.1 The Parties' Arguments

Plaintiff claims that Defendant violated the WDTPA on November 21, 2019 when it issued the Contract to Plaintiff. ECF No. 117 at 3. Specifically, Plaintiff claims that the Contract contained "several untrue, deceptive or misleading statements"—for example, that the Contract held

---

[15]The economic loss doctrine, which barred Plaintiff's intentional misrepresentation claim, *see supra* section 4.2.3, "does not serve as a bar to claims made under Wis. Stat. § 100.18." *Chris Hinrichs & Autovation Ltd. v. Dow Chem. Co.*, 937 N.W.2d 37, ¶ 56 (Wis. 2020).

Case 2:21-cv-01399-JPS   Filed 08/02/23   Page 39 of 69   Document 133

Defendant "out to be the manufacturer of the Machine when it [wa]s not" and that the "Machine would operate with [Plaintiff's] Bags as it was one of the central purposes of the Machine." *Id.* at 3–4. Plaintiff also argues that Defendant violated the WDTPA on August 17, 2020 when Defendant sent Plaintiff the FAT Video along with the statement that "[t]he machine was tested in the video link below at 45 PPM with the product received from Holland." *Id.* at 7.

Defendant argues that its Contract with Plaintiff "does not trigger the statute" because the WDTPA "only applies to representations made to the 'public.'" ECF No. 107 at 1. Plaintiff argues that it remained a member of the "public" for WDTPA purposes because Plaintiff "had no particular relationship with [Defendant] at the time the statements were made . . . ." ECF No. 117 at 6.

### 4.3.2    Wis. Stat. § 100.18 – the WDTPA

The WDTPA is codified at Wis. Stat. § 100.18. It provides, in relevant part, that

> [n]o person, firm, corporation, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place *before the public*, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed *before the public*, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio

or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind *to the public* relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. § 100.18(1) (emphases added).

"The purpose of the WDTPA 'is to deter sellers from making false and misleading representations in order to protect the public.'" *Weaver*, 2019 U.S. Dist. LEXIS 109550, at *6 (quoting *Novell v. Migliaccio*, 749 N.W.2d 544, ¶ 30 (Wis. 2008)). "Claims arising under the [WDTPA] have three required elements: "(1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was untrue, deceptive or misleading, and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (quoting *Novell,* 749 N.W.2d, ¶ 44). "'Silence—an omission to speak—is insufficient to support a claim' under the Act and thus it applies 'only [to] affirmative assertions, representations, or statements of fact that are false, deceptive, or misleading.'" *Id*. (quoting *Tietsworth*, 677 N.W.2d, ¶ 40).

"Like other state consumer protection statutes, the Act can be violated 'even if [the representation] is not literally false." *Id*. (quoting *Beardsall v. CVS Pharma, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020)). Rather, "a label is deceptive if it is likely to mislead a reasonable consumer in a material respect." *Id*. (quoting *Beardsall*, 953 F.3d at 973). "The Act thus 'may be satisfied by proof that a statement is likely to mislead a reasonable

consumer, even if the statement is literally true.'" *Id.* (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 761–62 (7th Cir. 2014)).

### 4.3.3 To or Before "the Public"

The Court must first address the parties' dispute regarding whether Plaintiff was part of "the public" such that the WDTPA applies. Wis. Stat. § 100.18(1). "'The public' is not defined in § 100.18, although courts have interpreted the term." *Chris Hinrichs*, 937 N.W.2d, ¶ 58 (citing *K&S Tool & Die Corp.*, 732 N.W.2d 792, ¶ 19 (Wis. 2007)).

Contrary to Defendant's repeated assertion, the alleged misrepresentation need not be directed to the public *at large*. *See* ECF No. 122 at 5 ("[N]one of the representations at issue in this case were made by [Defendant] to the public at large."). To the contrary, "a single representation to a single person is enough to trigger § 100.18(1)'s protections." *Chris Hinrichs*, 937 N.W.2d, ¶¶ 63–65, 70 (declining Defendant's invitation to overrule previous holding that one person can be "the public" for purposes of the WDTPA).

Wisconsin courts have consistently held that "a plaintiff remains a member of 'the public' unless a particular relationship exists between him or her and the defendant." *Id.*, ¶ 56 (quoting *K&S Tool & Die*, 732 N.W.2d, ¶ 27). "Whether [the parties] were in a 'particular relationship' so as to remove [Plaintiff] from the realm of 'the public' pursuant to Wis. Stat. § 100.18(1)" is a "question of fact that depends on the peculiar facts and circumstances of the case." *Id.*, ¶¶ 62, 71 (citing *K&S Tool & Die*, 732 N.W.2d, ¶ 27). However, "a plaintiff is no longer a member of 'the public' for purposes of Wis. Stat. § 100.18(1) once he or she has entered into a contract to purchase the offered item." *K&S Tool & Die*, 732 N.W.2d, ¶ 26 (citing *Kailin v. Armstrong*, 643 N.W.2d 132, ¶ 44 (Wis. Ct. App. 2002)).

There are various factors that may be relevant to this inquiry. For example, that the plaintiff has purchased from the defendant in the past may go towards a finding of a "particular relationship." *K&S Tool & Die*, 732 N.W.2d, ¶ 31. "On the other hand, factors that might cut against a finding of a particular relationship include[] that [the plaintiff's] prior purchase from [the defendant] occurred [several years] prior to the disputed transaction," and that the plaintiff "had purchased nothing else either before or after that purchase." *MDS Enters. v. Mid-State Truck Serv.*, 958 NW.2d 164, ¶ 45 (Wis. Ct. App. 2021) (quoting *K&S Tool & Die*, 732 N.W.2d, ¶ 32).

Here, Plaintiff had not purchased anything from Defendant prior to the transaction at issue. Plaintiff's first interaction with Defendant was through Johnson, when Lauren and Trevor attended a trade convention "with the intention of finding a machine that could automate the filling of [Plaintiff's] Royal Icing into its triangular premade polyethylene bags." ECF No. 102 at 2. Nor did Plaintiff purchase anything further from Defendant following the transaction at issue. These factors support a finding that Plaintiff, at the time it received the Contract from Defendant, constituted a member of "the public" for purposes of the WDTPA.

However, the fact that the parties were engaged in negotiations in furtherance of an anticipated transaction could lead a reasonable juror to conclude that the parties had a "particular relationship" such that the WDTPA does not apply. In *Donisi v. McGann*, 707 N.W.2d 581, ¶ 14 (Wis. Ct. App. 2005), the Wisconsin Court of Appeals held that because the parties there "had already established the particular relationship of negotiating parties" "at the time the alleged misrepresentations were made," the circuit court's conclusion that the WDTPA did not apply was

Case 2:21-cv-01399-JPS   Filed 08/02/23   Page 43 of 69   Document 133

not error. *See also Cousin Subs Sys. v. Better Subs Dev. Inc.*, No. 09-C-0336, 2011 U.S. Dist. LEXIS 112903, at *29 (E.D. Wis. Sept. 30, 2011) ("[T]here are insufficient facts to demonstrate that this was open to the public rather than a particular class of people who had previously shown interest in opening a Cousins franchise."); *but see Fricano v. Bank of Am., N.A.*, 875 N.W.2d 143, ¶ 30 (Wis. Ct. App. 2015) ("[W]e fail to understand how the fact that parties are in negotiations over terms takes the potential purchaser out of the realm of 'the public.'"). Because a reasonable juror could find either way—that is, that Plaintiff (at the time it received the Contract from Defendant) did or did not fall within "the public" for purposes of the WDTPA—the Court cannot dispose of this claim on that basis.

The same is not true, however, with respect to Plaintiff's status at the time it received the FAT Video from Defendant. This is so because, on December 2, 2019, Plaintiff executed the Contract proffered to it by Defendant, ECF No. 102 at 4, and the FAT Video was not taken and sent to Plaintiff until August of 2020, *id*. at 10.

Defendant argues that by the time Plaintiff received the FAT Video, Plaintiff had ceased to be a member of "the public" as required by WDTPA because Plaintiff was already in contractual privity with Defendant. ECF No. 107 at 4 ("Once [Plaintiff] and [Defendant] entered into the Contract on December 2, 2019, [Plaintiff] was no longer a member of the public because privity of contract renders the Act inapplicable."). In contrast, Plaintiff argues that while it executed the Contract on December 2, 2019, it did not pay the purchase price or any other consideration until May 6, 2020. ECF Nos. 117 at 4, 132 at 9. The Court is not sure why Plaintiff thinks that this saves its argument, since Plaintiff essentially concedes that the parties were bound by an enforceable Contract as of, at latest, May of 2020, meaning they

remained contractually bound three months later in August when Plaintiff received the allegedly deceptive FAT Video. This concession defeats Plaintiff's argument as a matter of law. *See K&S Tool & Die*, 732 N.W.2d, ¶ 26 ("[A] plaintiff is no longer a member of 'the public' for purposes of Wis. Stat. § 100.18(1) once he or she has entered into a contract to purchase the offered item.") (citing *Kailin*, 643 N.W.2d, ¶ 44). Therefore, Plaintiff's WDTPA claim as to the FAT Video fails on this element.

### 4.3.4   Untrue, Deceptive, or Misleading Representation

 Having so concluded, the Court proceeds to the next required element on Plaintiff's remaining claim that Defendant violated the WDTPA on November 21, 2019 when it issued the Contract to Plaintiff: that "the representation was untrue, deceptive or misleading." *Weaver,* 3 F.4th at 934 (quoting *Novell*, 749 N.W.2d, ¶ 44). Plaintiff specifically argues that the Contract included the misleading representations that Defendant was the manufacturer of the Machine, that the Machine would operate with Plaintiff's bags and Royal Icing, and that the Machine's "packaging systems were 'well-engineered.'" ECF No. 117 at 3–6.

Again, the alleged misrepresentation need not be "literally false," and it suffices for WDTPA liability if "a statement is likely to mislead a reasonable consumer, even if the statement is literally true." *Weaver*, 3 F.4th at 934 (quoting *Suchanek*, 764 F.3d at 761–62). However, statements that are mere "puffery" cannot support a Wis. Stat. § 100.18 claim. *United Concrete & Constr., Inc. v. Red-D-Mix Concrete, Inc.*, 836 N.W.2d 807, ¶ 19 (Wis. 2013).

The Court begins with Plaintiff's argument that the Contract misrepresented the Machine as being "well-engineered." ECF No. 117 at 6 (quoting ECF No. 102-10 at 8). This statement cannot support a Wis. Stat. § 100.18 claim as a matter of law because it constitutes mere "puffery." "[A]

salesperson who simply declares that his product is the 'best' or the like, is not representing a fact at all, let alone misrepresenting one. Rather, he is merely delivering a nebulous, abstract, highly *generalized* pitch for his wares." *United Concrete & Constr., Inc.,* 836 N.W.2d, ¶ 28. "Stated otherwise, commercial puffery is not within the ambit of legally actionable misrepresentation because it is the opinion of the speaker and 'not capable of being substantiated or refuted.'" *Stuart v. Weisflog's Showroom Gallery, Inc.,* 746 N.W.2d 762, ¶ 68 (Wis. 2008) (Roggensack, J., concurring in part, dissenting in part) (quoting *Tietsworth,* 677 N.W.2d, ¶ 44). Such is the case here. Declaring that one's products are "well-engineered" is an inherently abstract and generalized statement.

The Court next addresses Plaintiff's argument that the Contract misleadingly represented that the Machine would operate with Plaintiff's bags and Royal Icing. ECF No. 117 at 4–5. Defendant disputes that it made any "untrue representation[] about the Machine's ability to process [Plaintiff's] polyethylene bags." ECF No. 122 at 6.

The Contract provides that the Machine will dose "Frosting" in "Pre-made pouch[es]" of a size to be determined. ECF No. 102-10 at 4. Although, as discussed previously, the parties already knew this to be the case, the Contract does not specifically reference that Plaintiff used polyethylene bags, nor does it make any explicit guarantee that such bags would function with the Machine. As the Court previously noted, "'[s]ilence—an omission to speak—is insufficient to support a claim' under the Act . . . .'" *Weaver,* 3 F.4th at 934 (quoting *Tietsworth,* 677 N.W.2, ¶ 40). Plaintiff's assertions to the contrary are in error. ECF No. 132 at 6 (Plaintiff section header titled: "[Defendant] *omitted* key facts and important information") (emphasis added) and at 8 ("[S]uch *omissions* are actionable under Wis. Stat.

§ 100.18(1).") (emphasis added). Accordingly, the fact that Defendant failed to mention in the Contract that it had reason to suspect that the polyethylene bags Plaintiff used would not function with the Machine is insufficient to support a claim under the WDTPA.

The Court next addresses Plaintiff's argument that the Contract misleadingly represents that Defendant was the manufacturer of the Machine. The only reference to Tecnics—the true manufacturer—in the entirety of the Contract is the name of the Machine itself: the "FLtecnics Model FL .7 H PMP STU 1 XL HFS Machine with Integrated Liquid Filler." ECF No. 102-10 at 2. Plaintiff points out that Defendant's business name appears in large, bold font on the top of each page of the Contract, ECF No. 117 at 3, but the Court does not agree that this suggests anything with respect to responsibility for manufacturing—it merely suggests that Defendant is the party proffering the Contract. Plaintiff additionally notes that the Contract repeatedly characterizes the Machine as a "Matrix system" or "Matrix packaging system." *Id*. at 4. While this is somewhat more suggestive with respect to the origin of the Machine's construction, by itself it is not clear that it would be sufficient to mislead a reasonable consumer into believing that Defendant would be manufacturing the Machine rather than, for example, merely selling it.

The more concerning portion of the Contract, however, is that which appears on the last page. ECF No. 102-10 at 8. It provides the following:

> **About Matrix**: Founded in 1988, the driving force behind Matrix Packaging Machinery has been to deliver rugged, well-engineered, cost competitive, easy-to-use packaging systems backed by outstanding customer support.
>
> Matrix engineers are constantly focused on *making packaging machines* more rugged, versatile and easier to integrate with a wide range of feeding systems and peripheral equipment.

> Today *Matrix Packaging Machinery is the industry-leading manufacturer of v/f/f/s packaging equipment.* Matrix has machines in operation throughout the world, handling a wide range of products in very diverse conditions.

*Id.* (emphases added). The Court agrees that a reasonable juror, viewing the Contract as a whole but with particular focus on its last page, could conclude that a reasonable consumer could be misled into believing that Defendant would itself be manufacturing the Machine. The Contract makes no clear reference to the company that would actually make the Machine—Tecnics. Instead, the Contract describes Defendant as "the industry-leading manufacturer of v/f/f/s packaging equipment," references its "engineers" and their focus on "*making* packaging machines," refers to the Machine as being comprised of, *inter alia*, "Matrix vertical form-fill-seal equipment," and refers generally to the Machine as "Matrix equipment." *Id*. at 5, 8 (emphasis added). Therefore, this alleged untrue, deceptive, or misleading representation may proceed to the next step of the analysis.

### 4.3.5   Material Inducement Resulting in Pecuniary Loss

Having so concluded, the Court moves on to the final element required for liability under the WDTPA. That element is that "the representation materially induced (caused) a pecuniary loss to the plaintiff." *Weaver*, 3 F.4th at 934 (quoting *Novell*, 749 N.W.2d, ¶ 44). Put otherwise, would Plaintiff have engaged in the transaction with Defendant irrespective of the misleading statement regarding the Machine's manufacturer identity? *See Novell*, 749 N.W.2d, ¶ 51.

The Wisconsin Supreme Court in *Novell* acknowledged that "there are cases in which a circuit court may determine as a matter of law that a plaintiff's belief of a defendant's representation is unreasonable, and as a result the plaintiff's reliance is therefore also unreasonable." 749 N.W.2d, ¶

61. In such a case, "the circuit court may determine that the representation did not materially induce the plaintiff's decision to act and that plaintiff would have acted in the absence of the representation." *Id.*, ¶ 51; *see also Garver v. Krueger,* 917 N.W.2d 233, ¶ 20 (Wis. Ct. App. 2018) ("A plaintiff need not prove justifiable reliance in a Wis. Stat. § 100.18 claim, but the reasonableness of his or her reliance may be relevant in considering whether the representations induced the pecuniary loss.") (citing *Novell,* 749 N.W.2d, ¶ 47).

Defendant argues that "[Plaintiff] was familiar with packaging Machines and their manufacturers" such that any belief on Plaintiff's part that Defendant was the true manufacturer of the Machine was unreasonable. ECF No. 122 at 6. Defendant does not support this assertion with any factual or legal support. Nor can the Court find, in the parties' agreed upon statement of facts, any facts to support the assertion.

However, Plaintiff too does a poor job of explaining why the identity of the true manufacturer was material in its decision to contract with Defendant. In fact, Plaintiff does not appear to claim at all that the identity or location (domestic versus international) of its manufacturer bore any particular importance to it.

While the Court could certainly speculate as to why a domestic buyer might prefer a domestic manufacturer over an international one, the Court will not make Plaintiff's arguments or fill in the gaps for it. Plaintiff makes no such argument, and points to no admissible evidence, to demonstrate that the identity of the manufacturer of the Machine was material in inducing Plaintiff to contract with Defendant for purchase of the Machine. *See* ECF No. 122 at 6 ("At no point does [Plaintiff] allege that a

more explicit disclosure of [Tecnics] as the manufacturer would alter [Plaintiff's] decision to purchase the Machine . . . .").[16]

"[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). Plaintiff has failed to "put up" on this element of its WDTPA claim. *Id.* The Court is therefore constrained to deny its motion for summary judgment on this claim, ECF No. 116, and to grant Defendant's motion on the same, ECF No. 106.

---

[16]In response to this argument, Plaintiff argues that

> [Defendant] earned the trust of [Plaintiff] and it was that trust that caused [Plaintiff] to enter into the Proposal/Contract. Specifically, on September 22, 2019, Spencer Johnson wrote an internal email to his supervisor, Troy Snader, stating that Lauren Brooks "wants to do business with us, they trust us." See Ex. 5 at 3 (emphasis added).

ECF No. 132 at 4. First, this assertion is unsupported by anything in the parties' agreed upon statement of facts. The Court instructed the parties that motions for summary judgment and accompanying briefing should "omit a facts section" and that the Court would "only consider the single, agreed-upon statement of facts." ECF No. 39 at 4. Yet both parties repeatedly proffer and cite to facts not contained within their agreed upon statement of facts. *See Kreuziger v. Milwaukee County*, No. 19-CV-1747-JPS, 2022 U.S. Dist. LEXIS 134872, at *5 (E.D. Wis. July 29, 2022) ("[B]oth parties 'snuck' a facts section into their moving briefs . . . . [S]uch facts go . . . beyond those stipulated between the parties . . . . This is a clear flout of the Court's order.").

Second, even if Plaintiff's assertion were supported by facts not proffered in violation of the Court's trial scheduling order, the assertion is still a nonstarter. The issue is that there is nothing in the agreed upon statement of facts to support the conclusion that the identity of the Machine's manufacturer was material to Plaintiff. That "trust caused [Plaintiff] to enter into the" Contract with Defendant does not address that issue considering, as earlier noted, Defendant could have been involved in producing the Machine in any number of ways other than as simply—or even primarily—the manufacturer. ECF No. 132 at 4.

### 4.4 Limitation on Damages

The Court has concluded that Plaintiff is entitled to summary judgment on its breach of contract claim; accordingly, the Court now turns to the parties' arguments as to the scope of damages. Plaintiff moves for summary judgment on "Defendant's Affirmative Defense of Limitation of Damages." ECF No. 112. Defendant moves for partial summary judgment to the extent that Plaintiff's breach of contract "claim seeks recovery of damages above the purchase price [of the Machine]." ECF No. 105 at 1; ECF No. 104.

Defendant argues that "the Contract provides that [Plaintiff] may only recover under a limitation of damages provision, pursuant to common 'repair or replace' language." ECF No. 105 at 5; *see also id.* at 9 ("[It] is clear that the exclusive limited remedy of repair or replacement of the Machine applies . . . ."). Defendant argues that "[Plaintiff] ignores this limitation of damages and instead seeks damage well in excess of one million dollars from [Defendant] . . . ." *Id.* at 5.

Problematically, and as has already been illustrated in this Section's first two paragraphs, Defendant alternates in its briefing between characterizing Plaintiff's alleged exclusive remedy as one of repair or replacement, or, at other times, as "return of the purchase price." ECF No. 120 at 9; *see also* ECF No. 105 at 2 ("[D]efendant offered to purchase the Machine back at its full price, pursuant to the Contract's terms."); *but see* ECF No. 105 at 9 ("[I]t is clear that the exclusive limited remedy of repair or replacement of the Machine applies . . . .") and at 5 ("[T]he Contract provides that [Plaintiff] may only recover under a limitation of damages provision, pursuant to common 'repair or replace' language.").

And to this the Court asks: Well, which is it? The concept of repair or replace is not synonymous with that of refund. The distinction between these two concepts is evidenced by their separate recitation in Wis. Stat. § 401.719. *See* Wis. Stat. § 401.719(1)(a) (referencing "return of the goods and repayment of the price" *or* "repair and replacement of nonconforming goods or parts."). It is paradoxical for Defendant to alternate between asserting that each of such limitations are simultaneously applicable and individually exclusive here.

Setting that issue aside for the moment, the Contract provides that "[Defendant] warranties all parts but not the service time (labor) to replace any failed unit . . . ." ECF No. 102-10 at 5. It further provides that:

> [Defendant] shall in no way be liable for any losses, costs, forfeitures, damages, loss of profits, liabilities of the purchaser to its customers or third persons, and all other consequential damages, whether or not resulting from or contributed to by the default or negligence of [Defendant], its agents, employees, and subcontractors, which might be claimed as a result of a service rendered.

*Id*. The Contract later provides that "any specific terms and conditions included in this Customer Order shall supersede any inconsistent terms and conditions found in the website document [the T&Cs]." *Id*. at 7. The T&Cs provide:

> **8. WARRANTY:**
>
> (a) **Products Manufactured by Other Parties:** Seller makes no warranty to Buyer with respect to equipment manufactured by others and resold by Seller hereunder. Instead, such equipment will carry only the manufacturer's warranty.
>
> (b) **Products Manufactured by Seller:** Seller warrants Products of its own manufacture to be free of defects in material and/or workmanship, subject to the following

restrictions: Unless otherwise set forth in the Order documentation, Seller's warranty is valid for a period of 180 days from the date of delivery to the original Buyer. As Buyer's sole remedy for any breach of this Agreement by Seller, seller shall replace or repair any products found to be defective, at Seller's option, free of charge, exclusive of shipping and freight and labor incurred in removing or installing the defective Products. This warranty does not extend to Products damaged after date of shipment from Seller's plant where the damage is not directly due to a defect in material or workmanship. This warranty does not extend to Products altered or repaired by anyone other than Seller's authorized employees. This warranty does not extend to failure or damage due to negligence (other than that of Seller); accident; abuse; improper installation (other than installation made by Seller); improper operation or operation contrary to the specifications of the Products; use under abnormal conditions of temperature, moisture, dirt, or corrosion; or use with abrasive or corrosive materials. Seller will either examine the Products at Buyer's site, or issue shipping instructions for return to Seller (transportation costs pre-paid by Buyer). This warranty does not extend to expendable or consumable parts. This warranty does not apply to Products sold "as is." Any Products that Seller determines not to be defective as a result of faulty workmanship or material will be held subject to Buyer's disposition instructions upon payment by Buyer of the transportation and other charges, if any, advanced or to be advanced by Seller thereon.

(c)      **Limitations:** THE WARRANTIES SET FORTH IN THE FOREGOING PROVISIONS OF THIS SECTION ARE LIMITED TO THEIR PRECISE TERMS AND PROVIDE EXCLUSIVE REMEDIES, EXPRESSLY IN LIEU OF ALL OTHER REMEDIES. SELLER DISCLAIMS AND SHALL NOT BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, OR LOST PROFITS OR LOST OPPORTUNITY, ARISING FROM OR RELATED TO THIS AGREEMENT, ANY ACTUAL OR ALLEGED BREACH HEREOF, OR THE PRODUCTS. SELLER MAKES OR ASSUMES NO OTHER WARRANTIES OR GUARANTEES WHATSOEVER, WHETHER

EXPRESSED OR IMPLIED INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NEITHER BUYER NOR ANY OTHER PERSON IS AUTHORIZED TO ASSUME FOR SELLER ANY OBLIGATION OR LIABILITY NOT STRICTLY IN ACCORDANCE WITH THE FOREGOING OR TO REPRESENT THAT SELLER MAKES ANY OTHER WARRANTIES OR GUARANTEES. SELLER'S ENTIRE LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE PRODUCTS, INCLUDING WITHOUT LIMITATION SECTION 12 BELOW, SHALL BE LIMITED TO THE ACTUAL PURCHASE PRICE BAID BY BUYER FOR THE PRODUCTS AND SERVICES COVERED HEREBY.

ECF No. 102-11 at 3.

First, Plaintiff argues that Defendant "intended Section 8(c) to limit a buyer's damages only as to claims sounding in breach of warranty on equipment manufactured by [Defendant]," and that since it is undisputed that Defendant did not manufacture the Machine and Plaintiff does not sue for breach of warranty, Section 8(c) is inapplicable and does not limit Plaintiff's damages. ECF No. 113 at 2. Alternatively, Plaintiff argues, "[t]o the extent that [Section 8(c)] can be construed . . . to have a scope broader than limiting damages for warranty breaches, the clauses are inappropriately masked or concealed and should be disregarded . . . ." and that pursuant to Wis. Stat. § 402.719(2), the "limitation of remedies is not available" because it "fail[s] of its essential purpose." *Id*. at 11–13.[17] Lastly,

---

[17]Plaintiff also argues that the intentional misrepresentation it alleges Defendant to have committed "prevent[s] Defendant from asserting limitation of damages as an affirmative defense." ECF No. 113 at 12. The Court need not address this argument as it has granted Defendant's motion for summary judgment on Plaintiff's intentional misrepresentation claim. *See supra* section 4.2.3 (concluding that the economic loss doctrine bars Plaintiff's intentional misrepresentation claim).

Plaintiff argues that since the provision in the Contract itself uses the phrase "as a result of a service rendered," "only . . . any damages caused by [Defendant] during the course of servicing the Machine is limited." ECF No. 123 at 27 (quoting ECF No. 102-10 at 5).

Defendant contends that "Section 8(c) is not limited to a breach of warranty" but instead "limits all damages arising under the Agreement." ECF Nos. 105 at 8, 126 at 7 (quoting ECF No. 102-11 at 3) ("SELLER'S ENTIRE LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT . . . ."). Defendant also emphasizes that, irrespective of the interpretation of Section 8(c) in the T&Cs, the Contract itself disclaims consequential damages, provides that Defendant "warranties all parts" (accordingly making Section 8(c) applicable per Plaintiff's own interpretation), and provides that the Contract's terms supersede any "inconsistent term[] or condition[]" in the T&Cs. ECF No. 105 at 9 (citing ECF No. 102-10 at 5–7).

The Court will cut to the chase. The Contract's terms regarding limitation of damages supersede those of the T&Cs. ECF No. 102-10 at 7. The Court will therefore set aside the Parties' arguments regarding interpretation of the T&Cs, at least for the time being.

The Contract itself disclaims liability on the part of Defendant for consequential damages "which might be claimed as a result of a service rendered." *Id*. Plaintiff argues that this language means that "any damages caused by [Defendant] *during the course of servicing the Machine* is limited," but that "[t]he scope of this term does not cover damages [Defendant] caused by breaching the Contract and delivering a machine that cannot meet contract specifications . . . ." ECF No. 123 at 27. For example, Plaintiff argues that this provision would limit Defendant's liability attributable to

Tatay servicing the Machine upon its arrival at Defendant's facility, but that it would not limit Defendant's liability with respect to the inoperability of the Machine as a general matter. The Court does not agree with Plaintiff's narrow reading.

The disclaimer language regarding damages that "might be claimed as a result of a service rendered" is specifically placed in the "Startup and Interfacing Policy" section of the Contract. ECF No. 102-10 at 5. However, the section also discusses the performance of the equipment itself as a general matter. The section provides that Defendant "warranties all parts" of the equipment, notes that "there is always a possibility of a component failing due to shipment damage or early failure," and cautions that Defendant "shall ultimately bear no responsibility for the operation/performance of equipment that has not been purchased through [Defendant]." *Id*. The section is not, therefore, strictly limited to matters relating to servicing the Machine, as Plaintiff suggests.

And under Wisconsin contract law, "[t]he language of the provision, not its heading, controls [the court's] analysis." *Anderson v. Cincinnati Cas. Co.*, 727 N.W.2d 374, ¶ 16 (Wis. Ct. App. 2006) (citing *Progressive N. Ins. Co. v. Hall*, 709 N.W.2d 46, ¶ 31 (Wis. 2006) (rejecting Plaintiff's argument that heading rendered clause ambiguous)); *see also Kurt Van Engel Comm'n Co. v. Zingale*, 696 N.W.2d 280, ¶ 53 (Wis. Ct. App. 2005) (Fine, J., dissenting) (citing Wis. Stat. § 990.001(6) ("[T]itles are almost never dispositive of parameters of the parties' agreement.")). Therefore, although the title of this section is labeled "Startup and Interfacing of the Machine," more compelling is the fact that the section's provisions are not so limited.

The conclusion that this limitation of liability provision is not limited solely to damages arising from servicing the Machine is also supported by

the definition of "service" versus that of "servicing." "Service" means "[w]ork performed" as a general matter.[18] It may therefore extend, in this case, to, for example, design and provision of the Machine itself. "Servicing," in contrast, is generally understood as "the act or process of overhauling or repairing."[19] Contrary to Plaintiff's reading, the Contract does not use the narrower word "servicing," and the overall context of the section does not reasonably allow for it to be read in in place of the more general "service rendered" language. Accordingly, Plaintiff's damages as a whole—not just damages related to "servicing" of the Machine—are limited by the Contract.

"Wis. Stat. § 402.719 permits the parties to contractually modify or limit the remedies available under the U.C.C." *Tankstar USA, Inc. v. Navistar, Inc.*, No. 2017AP1907, 2018 Wisc. App. LEXIS 890, at *17 (Wis. Ct. App. Nov. 27, 2018). That section provides specifically that

> [An] agreement may provide for remedies . . . in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of the nonconforming goods or parts . . . .

Wis. Stat. § 402.719(1)(a).

---

[18]Service, BALLENTINE'S LAW DICTIONARY (2010); *see also* Service, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/service [https://perma.cc/Y8KH-PD4F].

[19]Servicing, COLLINS DICTIONARY, https://www.collinsdictionary.com/us/dictionary/english/servicing [https://perma.cc/W8EH-FYEL]; *see also* Servicing, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/servicing [https://perma.cc/U8HP-6VNF] ("[T]he process of examining a machine and repairing any damaged parts.").

"However, the UCC disfavors limitations on remedies and provides for their deletion where they would effectively deprive a party of reasonable protection against breach." *Murray v. Holiday Rambler, Inc.*, 265 N.W.2d 513, 520 (Wis. 1978) (citing *Chemetron Corp. v. McLouth Steel Corp.*, 381 F. Supp. 245, 250 (N.D. Ill. 1974)). Accordingly, "the full panoply of U.C.C. remedies is available '[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose.'" *Tankstar USA*, 2018 Wisc. App. LEXIS 890, at *17 (quoting Wis. Stat. § 402.719(2)).

"It is unusual for a remedy to fail of its essential purpose, but this typically occurs when a contract's primary remedy is repair or replacement of defective parts, and this remedy fails to put the goods in their warranted condition." *Sunny Indus. v. Rockwell Int'l Corp.*, Nos. 98-2824, 98-2875, 1999 U.S. App. LEXIS 7001, at *29 (7th Cir. Apr. 12, 1999) (citing *Rudd Constr. Equip. Co. v. Clark Equip. Co.*, 735 F.2d 974, 981 (6th Cir. 1984) and *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 292 (4th Cir. 1982)). "Under the UCC, a remedy does not fail of its essential purpose simply because one party struck a bad bargain that it later regrets." *Id.* (citing *JOM, Inc. v. Adell Plastics, Inc.*, 151 F.3d 15, 28 (1st Cir. 1998)). "Moreover, it 'does not mean that an exclusive remedy has "failed of its essential purpose" whenever a contracting party loses money because a limited remedy provision prevents him from being fully reimbursed for the damages caused by the other party's breach.'" *Id.* (quoting *J.D. Pavlak, Ltd. v. William Davies Co., Inc.*, 351 N.E.2d 243, 246 (Ill. App. Ct. 1976)).

Instead, "whether a remedy has failed of its essential purpose turns upon whether the circumstances are such that the buyer has been deprived of the substantial value of the bargain." *Tankstar USA*, 2018 Wisc. App. LEXIS 890, at *18 (citing *Murray*, 265 N.W.2d at 520). "In other words, a

contract that purports to limit the remedies available for breach must nonetheless provide 'a fair quantum of remedy.'" *Id*. (quoting *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1010 (7th Cir. 1996)).

"In turn, this principle requires the party claiming breach to demonstrate 'harm that the contractual remedy was incapable of curing.'" *Id*. (quoting *Waukesha Foundry*, 91 F.3d at 1010). "Although it is typically a question of fact whether a 'repair and replace' remedy is inadequate, . . . if the record evidence permits only one conclusion, that question of fact may be answered by the court as a matter of law . . . ." *Id*. at *18–19 (citations omitted).

"[A] 'repair or replace' remedy can fail of its essential purpose in two ways." *Id*. at *19. "The most obvious way is if a seller flatly refuses to accept the good for repair or replacement . . . ." *Id*. That does not appear to have occurred here. *See* ECF No. 102 at 17 ("On November 16, 2020 and November 18, 2020, the parties discussed returning the Machine back to [Defendant] under certain terms and conditions that the parties ultimately could not agree upon.").

Alternatively, "a 'repair and replace' remedy can fail of its essential purpose if repairs or replacement are so frequently required that the purchaser has been effectively deprived of the benefit of the bargain." *Tankstar USA*, 2018 Wisc. App. LEXIS 890, at *19 (citing *Midwhey Powder Co. v. Clayton Indus.*, 460 N.W.2d 426, 430 (Wis. Ct. App. 1990)); *see also id*. at *22–23 ("To prevail on its claim for consequential and other damages (i.e., to avoid the exclusive and limited remedy contemplated by the manufacturer's warranties and service contracts), [Plaintiff] must demonstrate that repairs have been so frequent and numerous that it has

effectively been deprived of the beneficial use of the product it purchased.").

"The purpose of an exclusive remedy of repair or replacement, from the buyer's standpoint, is to give him goods which conform to the contract . . . within a reasonable time after a defect is discovered." *Murray*, 265 N.W.2d at 520 (citing *Conte v. Dwan Lincoln-Mercury, Inc.*, 374 A.2d 144 (Conn. 1976), *Beal v. Gen. Motors Corp.*, 354 F. Supp. 423 (D. Del. 1973), and *Moore v. Howard Pontiac-American, Inc.*, 492 S.W.2d 227 (Tenn. Ct. App. 1972)). "The buyer of an automobile," for example, "is not bound to permit the seller to tinker with the article indefinitely in the hope that it may ultimately be made to comply . . . ." *Id*. at 521 (citing 46 Am. Jur. Sales § 732 and 77 C.J.S. Sales § 340). "At some point in time, if major problems continue to plague the automobile, it must become obvious . . . that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free of defect . . . ." *Id*. (quoting *Orange Motors of Coral Gables v. Dade Co. Dairies*, 258 So.2d 319, 320, 321 (Fla. App. 1972)). "In other words, the relevant 'benefit of the bargain' is that the purchaser is able to use the goods, in a meaningful manner, following their repair or replacement." *Tankstar USA*, 2018 Wisc. App. LEXIS 890, at *19–20.

As is evidenced by the parties' agreed upon facts, no amount of "tinker[ing]" with the Machine would "give [Plaintiff] goods which conform to the contract . . . within a reasonable time after a defect is discovered." *Murray*, 265 N.W.2d at 520. Several months after the Machine was delivered to Plaintiff and had already been extensively "tinker[ed]" with, *id.*, Defendants' own Director of Distributed Product Lines, Diaz, conceded that there were "to [sic] many issues to address." ECF No. 102 at

16. Furthermore, there is no reason to think that replacement of the Machine with an identical, new one would not bring identical problems.

"Where the seller is given reasonable opportunity to correct the defect or defects, and the vehicle nevertheless fails to operate as should a new vehicle free of defects, the limited remedy fails of its essential purpose." *Murray*, 265 N.W.2d at 521 (collecting cases). "This is true regardless of the seller's commendable efforts and considerable expense in attempting to repair or replace a non-conforming product." *Sunny Indus.*, 1999 U.S. App. LEXIS 7001, at *31 (citing *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 356 (Minn. 1977)). Such is the case here. *See id*. at *32–33 (finding that exclusive remedy failed of its essential purpose where the equipment "does not operate according to specifications and apparently never will," which "resulted in [Plaintiff] being stuck with a press that fails to meet the performance specifications for which it bargained").

Accordingly, to the extent that Defendant maintains that Plaintiff's "exclusive limited remedy" is "repair or replacement of the Machine," ECF No. 105 at 9, that remedy fails of its essential purpose as a matter of law because it indisputably deprives Plaintiff of the "substantial value of the bargain," *Tankstar USA*, 2018 Wisc. App. LEXIS 890, at *17 (citing *Murray*, 265 N.W.2d at 521), and the "breach . . . caused [Plaintiff] harm that the contractual remedy was incapable of curing," *Waukesha Foundry*, 91 F.3d at 1010.

But the problem—as noted earlier—is that it is not at all clear that repair or replacement of the Machine is truly Plaintiff's exclusive remedy, and Defendant's own briefing only muddies the waters. As discussed, Defendant alternates at random between characterizing Plaintiff's exclusive remedy as one of repair or replacement or, at other times, as return of the

purchase price of the Machine. Again, to the extent that the exclusive remedy is truly one of repair or replacement, it fails of its essential purpose as a matter of law, the consequence being that "[t]he buyer may . . . invoke any of the remedies available under the UCC . . . ." *Murray*, 265 N.W.2d at 521 (citing *Moore*, 492 S.W.2d 227 and *Jacobs v. Metro Chrysler-Plymouth, Inc.*, 188 S.E.2d 250 (Ga. Ct. App. 1972)). But to the extent that the exclusive remedy is return of the purchase price, the same is not true. *See Dental Health Prods., Inc. v. Sunshine Cleaning Gen. Servs.*, No. 21-C-1358, 2023 U.S. Dist. LEXIS 29019, at *14 (E.D. Wis. Feb. 22, 2023) ("The limitation of liability did not leave [Plaintiff] with 'no remedy at all.' . . . [Plaintiff's] remedy was the return of its money."). Resolution of the issue of which remedy is truly the exclusive one is therefore critical.

Defendant's references in its briefing to Plaintiff's exclusive remedy as one of "repair or replace[ment]" are unsupported by any cite to or quotation from the Contract. *See* ECF No. 105 at 5 (stating that "the Contract provides that [Plaintiff] may only recover under a limitation of damages provision, pursuant to common 'repair or replace' language," but failing to provide any citation in support of that assertion). And the Court's own review of the Contract reveals that the word "repair," for example, appears nowhere therein. Nor, however, do the words "refund," "return," "purchase price," or any other term or phrase that might allow a reader to conclude that Plaintiff's true exclusive remedy is one of return of the purchase price of the Machine. In other words, the Contract prohibits recovery of certain types of remedies (i.e., consequential damages) without specifying what remains to serve as an acceptable remedy.

Since the Contract itself does not specify what Plaintiff's true exclusive remedy is, the Court returns to the T&Cs. The Contract provides

that its own terms supersede any inconsistent terms in the T&Cs, ECF No. 102-10 at 7, but there can be no inconsistency when the Contract itself is silent on the issue. *See, e.g.*, *Ninaus v. State Farm Mut. Auto. Ins. Co.*, 584 N.W.2d 545, 548–49 (Wis. Ct. App. 1998) (citing *Gaspar v. Linvatec Corp.*, 952 F. Supp. 1274, 1280 (N.D. Ill. 1997) (finding "no disagreement" with legal principle that "where one document is silent and the other is clear, no 'conflict' exists")).

The T&Cs state unequivocally that "SELLER'S ENTIRE LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT . . . SHALL BE LIMITED TO THE ACTUAL PURCHASE PRICE PAID BY BUYER FOR THE PRODUCTS AND SERVICES COVERED HEREBY." ECF No. 102-11 at 3. Plaintiff attempts to convince the Court that this provision does not apply in part because it is included in a section entitled "WARRANTY," ECF No. 113 at 4, but the Court has already rejected a similar argument. *See Anderson*, 727 N.W.2d, ¶ 16 ("The language of the provision, not its heading, controls [the court's] analysis."). Notwithstanding that the above-quoted sentence appears in a section titled WARRANTY and is included with some warranty-related provisions, it unambiguously limits Plaintiff's recovery—associated with the transaction as a whole—to return of the purchase price. Accordingly, notwithstanding Defendant's occasional reference to "repair or replace[ment]," Plaintiff's true exclusive remedy is refund of the purchase price of the Machine.

Finally, the Court addresses Plaintiff's argument that, to the extent the Court interprets the T&Cs' exclusive remedy provision as applicable, such provision is "unconscionable" and "inconspicuous" because it is

Case 2:21-cv-01399-JPS    Filed 08/02/23    Page 63 of 69    Document 133

"disguise[d] or conceal[ed]" in the overall section, and that it should therefore be disregarded. ECF No. 113 at 9–12.[20]

Wis. Stat. § 402.719(3) provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not." Additionally, Wis. Stat. § 401.201(2)(f) provides that "'[c]onspicuous,' . . . means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is 'conspicuous' or not is a decision for the court.'" It provides further that

> [c]onspicuous terms include any of the following:
>
> 1. A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size.
>
> 2. Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

*Id.*

Plaintiff primarily relies on *Phillips Petroleum Co. v. Bucyrus-Erie Co.*, 388 N.W.2d 584 (Wis. 1986). There, the Wisconsin Supreme Court affirmed the trial court's holding that a sentence-long disclaimer of liability located in a paragraph-long section entitled "WARRANTY" was inconspicuous

---

[20]Plaintiff's assertion that "[l]ooking at the entire agreement, there is no other additional language or term that governs or places [Plaintiff] on notice of any attempt to limit any remedy which [Plaintiff] may have against [Defendant] for breach of contract," *id*. at 6, is simply incorrect. The Court has already discussed at length the Contract's own limitation of liability provision, ECF No. 102-10 at 5, its interpretation, and its effect on this case.

and misleading and therefore unenforceable. *Phillips*, 388 N.W.2d at 587–90 ("[T]he terms . . . disclaiming or limiting responsibility, were ineffective because they were not 'conspicuous,' . . . [and] they were misleading because they appear under the heading of 'Warranty,' while, in fact, they, in the main, are disclaimers of warranty *and liability*.") (emphasis added). "[W]e do not disagree with the trial court's conclusion that a disclaimer of liability or a limitation on damages that is inappropriately masked under a heading captioned, 'Warranty,' is itself a reason to disregard it . . . ." *Id.* at 591.

Two years later, in *Bucyrus-Erie Co. v. Bill's Coal Co.*, No. 79-C-838, 1988 U.S. Dist. LEXIS 19804, at *15–16 (E.D. Wis. Aug. 12, 1988), the court addressed "text contained in another Bucyrus-Erie Co. Contract." The court rejected the notion that the Wisconsin Supreme Court in *Phillips* had "set out . . . a bright line rule" and that "a disclaimer found under the heading 'GUARANTY,' . . . [wa]s per se inconspicuous." *Id.* at *16. Instead, the court wrote that the Wisconsin "supreme court looked to form as only one factor" in the conspicuousness analysis. *Id.* Ultimately, the court concluded that the provision was conspicuous, and therefore enforceable, both "[w]ith regard to its physical context, on the face of the contract," as well as "given the broader context of the negotiations." *Id.* at *19; *see also Dental Health Prods.*, 2023 U.S. Dist. LEXIS 29019, at *15 (The liability limitation . . . was the product of negotiation and bargaining between sophisticated businesses . . . . Under these circumstances, the limitation is not unconscionable and must be enforced.") (citation omitted); *but see Sanchelima Int'l, Inc. v. Walker Stainless Equip. Co., LLC*, No. 16-cv-644-jdp, 2017 U.S. Dist. LEXIS 197560, at *8 (W.D Wis. Dec. 1, 2017) ("But unconscionable limitations provisions may

exist even when the contract is negotiated between sophisticated parties.")
(citing *Trinkle v. Schumacher Co.*, 301 N.W.2d 255, 259 (Wis. Ct. App. 1980)).

Here, Section 8 of the T&Cs entitled "WARRANTY" consists of three separate paragraphs. ECF No. 102-11 at 3. The last of the three paragraphs—that in which the relevant limitation of liability language is found—is fully capitalized. The distinguishing effect of the use of capital letters is reduced somewhat when used for an entire paragraph. Notably, however, no other paragraph in the entirety of the T&Cs is fully capitalized, which serves to distinguish it from the remainder of the T&Cs. Furthermore, unlike in *Phillips*, the limitation of liability language is in a subparagraph entitled, in bolded font, "Limitations," *id.*, rather than hidden in one general paragraph entitled "WARRANTY." The Court is therefore satisfied that the situation is distinct from *Phillips* and the limitation of liability language at issue here is conspicuous.

Nor has Plaintiff convinced the Court that the provision is otherwise unconscionable. "Unconscionability has generally been recognized to include an absence of meaningful choices on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Discount Fabric House v. Wis. Tel. Co.*, 345 N.W.2d 417, 424 (Wis. 1984) (citing *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965)). "Factors to be considered when determining unconscionability can be divided into procedural and substantive categories." *Dry Dock, LLC v. Godfrey Conveyor Co.*, 717 F. Supp. 2d 825, 834 (W.D. Wis. 2010). "Procedural factors include the parties' age, intelligence, business experience, bargaining power, whether the terms were explained to the weaker party, whether alterations in the terms were possible and whether there were any alternative sources of supply." *Id.* (citing *Discount Fabric House*, 345 N.W.2d

at 425). "The substantive determination is whether the contract terms are commercially reasonable." *Id*. "Both procedural and substantive factors must be present for a court to find contractual terms to be unconscionable." *Id*. (citing *Cottonwood Fin., Ltd. v. Estes*, 784 N.W.2d 726, ¶ 1 (Wis. Ct. App. 2010)).

This issue has not been appropriately briefed, and the parties' joint statement of undisputed facts does not appear to have been drafted with this analysis in mind. Plaintiff proffers no argument with respect to any lesser degree of bargaining power or sophistication on its part. Plaintiff does not argue that it lacked any meaningful choice with respect to the transaction. Plaintiff states only that the damages allowed by Section 8(c) are "unconscionably low." ECF No. 113 at 14. But even assuming *arguendo* that is true, it is insufficient to show unconscionability as a matter of law, because Plaintiff bears the burden of showing both procedural *and* substantive aspects of unconscionability. *Dry Dock*, 717 F. Supp. 2d at 834. Accordingly, the Court will deny Plaintiff's motion for summary judgment on "Defendant's Affirmative Defense of Limitation of Damages," ECF No. 112. Based on the foregoing analysis, Plaintiff is entitled to an award of damages from Defendant in the amount of the full purchase price of the Machine, or $265,000.00.

**5.    CONCLUSION**

For the reasons discussed herein, the Court will grant Plaintiff's motion for summary judgment on its breach of contract claim, ECF No. 110, but will dismiss Plaintiff's claims for intentional misrepresentation and for violation of the WDTPA. The Court will also grant Defendant's motion for summary judgment, ECF No. 104, to the extent that it asserts that Plaintiff's exclusive remedy for breach of contract is limited to recovery of the full

purchase price of the Machine. Finally, the Court will dismiss the case and thus deny as moot the currently pending Rule 702 motions and motions in limine, ECF Nos. 80, 82, 84.

Accordingly,

**IT IS ORDERED** that Defendant Matrix Packaging Machinery, LLC's motion for partial summary judgment on Plaintiff's breach of contract claim, ECF No. 104, be and the same is hereby **DENIED** with respect to liability and **GRANTED** with respect to limitation of damages;

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment on its breach of contract claim, ECF No. 110, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment on its false representation claim, ECF No. 114, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Matrix Packaging Machinery LLC's motion for summary judgment on Plaintiff's intentional misrepresentation claim, ECF No. 108, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's intentional misrepresentation claim be and the same is hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment on its Wisconsin Deceptive Trade Practices Act, ECF No. 116, claim be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Matrix Packaging Machinery, LLC's motion for summary judgment on Plaintiff's Wisconsin

Deceptive Trade Practices Act claim, ECF No. 106, be and the same is hereby **GRANTED**;

IT IS FURTHER ORDERED that Plaintiff's Wisconsin Deceptive Trade Practices Act claim be and the same is hereby **DISMISSED with prejudice**;

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment on "Defendant's Affirmative Defense of Limitation of Damages," ECF No. 112, be and the same is hereby **DENIED**;

IT IS FURTHER ORDERED that Plaintiff is entitled to, and shall have and recover from Defendant Matrix Packaging Machinery, LLC the exclusive remedy of return of the full purchase price of the Machine (in the amount of $265,000.00);

IT IS FURTHER ORDERED that the parties' Rule 702 motions and motions in limine, ECF Nos. 80, 82, 84, be and the same are hereby **DENIED as moot**; and

IT IS FURTHER ORDERED that this action be and the same is hereby **DISMISSED**.

The Clerk of Court is instructed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 2nd day of August, 2023.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge